The New Jersey Steam Navigation Company, Respondents and Appellants, v. The Merchants' Bank of Boston, Libellants.

A decree of the Circuit Court of Rhode Island affirmed, which was a judgment upon a libel *in personam* against a steamboat company for the loss of specie carried in their boat by one of the persons called "express carriers," and lost by fire in Long Island Sound.

This was an appeal from the Circuit Court of the United States for the District of Rhode Island, in the exercise of admiralty jurisdiction.

In February, 1839, the State of New Jersey chartered a company by the name of the New Jersey Steam Navigation Company, with a capital of five hundred thousand dollars, for the purpose of purchasing, building, repairing, and altering any vessel or vessels propelled by steam, and in the navigation of the same, &c., &c.; under which charter they became proprietors of the steamboat Lexington.

On the 1st of August, 1839, the following agreement was made : —

" This agreement, made and entered into this 1st day of August, A. D. 1839, in the city of New York, by William F. Harnden, of Boston, Massachusetts, on the one part, and Ch. Overing Handy, President of the New Jersey Steam Navigation Company, of the other part, witnesseth :

" That the said William F. Harnden, for and in consideration of the sum of two hundred and fifty dollars per month, to be paid monthly to the said New Jersey Steam Navigation Company, is to have the privilege of transporting in the steamers of said company, between New York and Providence, via Newport and Stonington, not to exceed once on each day, from New York and from Providence, and as less frequently as the boats may run between and from said places, one wooden crate, of the dimensions of five feet by five feet in width and height, and six feet in length (contents unknown), until the 31st of December, A. D. 1839, and from this date.

" The following conditions are stipulated and agreed to, as

part of this contract, to wit : — The said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden; and the New Jersey Steam Navigation Company will not, in any event, be responsible, either to him or his employers, for the loss of any goods, wares, merchandise, money, notes, bills, evidences of debt, or property of any and every description, to be conveyed or transported by him in said crate, or otherwise, in any manner, in the boats of the said company.

"Further, that the said Harnden is to attach to his advertisements, to be inserted in the public prints, as a common carrier, exclusively responsible for his acts and doings, the following notice, which he is also to attach to his receipts or bills of lading, to be given in all cases for goods, wares, and merchandise, and other property committed to his charge, to be transported in said crate or otherwise : —

"'Take notice. — William F. Harnden is alone responsible for the loss or injury of any articles or property committed to his care ; nor is any risk assumed by, nor can any be attached to, the proprietors of the steamboats in which his crate may be, and is transported, in respect to it or its contents, at any time.'

"Further, that the said Harnden is not to violate any provisions of the post-office laws, nor to interfere with the New Jersey Steam Navigation Company in its transportation of letters and papers, nor to carry any powder, matches, or other combustible materials of any kind, calculated to endanger the safety of said boats, or the property or persons on board of them.

"And that this contract may be at any time terminated by the New Jersey Steam Navigation Company, or by the said Harnden, upon one month's notice given in writing.

"Further, that a contract made by the said Harnden with the Boston and New York Transportation Company, on the 5th day of July, A. D. 1839, is hereby dissolved by mutual consent.

"In witness whereof, the said William F. Harnden has hereunto set his hand and seal, and the President of the said New Jersey Steam Navigation Company has hereto affixed his signature and the corporate seal of the company.

"WM. F. HARNDEN,  [L. S.]

CH. OVERING HANDY, *President.*

"Sealed and delivered in presence of
 ROSWELL E. LOCKWOOD."

It is proper to remark, that, prior to the date of this agreement, Harnden had made a similar one with the Boston and

New York Transportation Company, which became merged in the New Jersey Steam Navigation Company on the 1st of August, 1839. Harnden, having begun to advertise in the newspapers in July, 1839, whilst his contract with the Boston company was in force, continued to use the name of that company in the following advertisement, which was inserted in two of the Boston newspapers until the end of the year 1839.

"Boston and New York Express Package Car. — Notice to Merchants, Brokers, Booksellers, and all Business Men.

"Wm. F. Harnden, having made arrangements with the New York and Boston Transportation, and Stonington and Providence Railroad Companies, will run a car through from Boston to New York, and *vice versâ*, via Stonington, with the mail train, daily, for the purpose of transporting specie, small packages of goods, and bundles of all kinds. Packages sent by this line will be delivered on the following morning, at any part of the city, free of charge. A responsible agent will accompany the car, who will attend to purchasing goods, collecting drafts, notes, and bills, and will transact any other business that may be intrusted to his charge.

"Packages for Philadelphia, Baltimore, Washington, New Haven, Hartford, Albany, and Troy, will be forwarded immediately on arrival in New York.

"N. B. Wm. F. Harnden is alone responsible for any loss or injury of any articles or property committed to his care; nor is any risk assumed by, or can any be attached to, the Boston and New York Transportation Company, in whose steamers his crates are to be transported, in respect to it or its contents, at any time."

The above-mentioned contract with the New Jersey Steam Navigation Company being about to expire, Harnden addressed letters, on the 7th and 16th of December, to the President, expressing a desire to renew it, and, on the 31st of December, received a letter from Mr. Handy, the President, renewing the contract for one year from the 1st of January, 1840.

The New Jersey Company also published the following notice : —

"Notice to Shippers and Consignees.

"All goods, freight, baggage, bank-bills, specie, or any other kind of property, taken, shipped, or put on board the steamers of the New Jersey Steam Navigation Company, must be at the risk of the owners of such goods, freight, baggage, &c.; and all freight consisting of goods, wares, and merchandise, or any other property landed from the steamers, if not taken away

from the wharf without delay, will be put under cover at the risk of the owners of said goods, freight, baggage, &c., in all respects whatsoever."

The bills of lading, or receipts given by the company, were in the following form : —

"New Jersey Steam Navigation Company.

"Received of                 on board the steamer master marked and numbered as in the margin, to be transported to and there to be delivered to or assigns, danger of fire, water, break-age, leakage, and all other accidents excepted ; and no package whatever, if lost, injured, or stolen, to be deemed of greater value than two hundred dollars.

"Freight as customary with the steamers on this line.

"N. B. The company are to be held responsible for ordinary care and diligence only in the transportation of merchandise, and other property, shipped or put on board the boats of this line.

"Dated at         the         18

"(Contents unknown.)"

In January, 1840, Mr. Harnden received from the Merchants' Bank in Boston a large amount of checks and drafts upon New York, which he was to collect in specie, and transmit the proceeds to Boston.

On the 13th of January, 1840, the sum of eighteen thousand dollars, in gold and silver coin, was shipped by William F. Harnden, and received on board of the steamboat Lexington, said boat being the property of the New Jersey Steam Navigation Company, and employed in making regular trips between New York and Stonington in Connecticut. The shipment was made at New York. The boat left New York about half past four o'clock in the afternoon, and in the course of a few hours a fire broke out, which totally destroyed the boat, the lives of nearly all the passengers and crew, and the property on board. The money, amongst the other property, was lost. As the circumstances under which the loss took place were much commented on in the argument, it may be proper to insert the narrative of Stephen Manchester, the pilot, who was examined as a witness : —

"To the third interrogatory he saith : — She was near Huntington lighthouse, some four miles east of the light, and between forty and fifty miles from New York. It was about

half past seven o'clock in the evening. I know the hour, because we always take down on a slate the hour that we pass every lighthouse. This was the business of the pilot. I was in the wheel-house when I heard that the boat was on fire. Some one came to the wheel-house, and told the wheel-man and myself that the boat was on fire. I stepped out of the wheel-house and went up to the smoke-pipe. I saw the fire blazing up through the promenade deck, around the smoke-pipe. The promenade deck was on fire, and was blazing up two or three feet. I looked down a scuttle which went through the promenade deck, and which was about three or four feet on the larboard side, a little abaft of the smoke-pipe; it was not exactly abreast of it or abaft of it, but quartering. The scuttle led down between the after part of the boiler and the forward part of the engine. In looking through the scuttle I saw blaze and smoke, as if she was on fire there. I can't say whether or not the main deck was on fire at that time. I next returned to the wheel-house, and hove the wheel hard over a-port, which would sheer the boat to the southward, for the purpose of running the boat ashore to the nearest land, which was Long Island shore. Just as I got the wheel hove a-port, Captain Childs came in and put his hand on the spoke of the wheel. As he took hold of the wheel, the starboard wheel-rope gave way. Within an instant from that time, the smoke broke into the wheel-house, so that we were obliged to leave it. Captain Childs went out of the wheel-house and went aft, and I did not see any thing of him after that. I then stepped out, and called to some of our people on the forecastle to get out the fire-engine. They got it out. I then told them to get out the hose and the fire-buckets. The fire then spread so between decks that they could not get at the hose or buckets. I then went to the life-boat, and found some men there casting off the lashings with which she was fastened to the promenade deck. I caught hold of the lashings, and told them not to cast them off till we had attached a hawser to the boat. I sang out to some one on the forecastle to pass up a hawser to attach to the boat, which was done. I then told them to take the hawser attached to the boat, and to fasten it to the forward part of the steamer. The fire then was burning up through the deck and around the life-boat, and I cut the lashings, and told the men to throw the boat overboard; I then jumped down on to the forward deck, caught hold of the hawser, and found that it was not made fast to the steamboat, as directed. I found the boat was getting away from us, and I sang out to the people about there to hang on to the hawser, or we should lose her. They let go of the hawser, one after another, until they let the boat

go. The promenade deck was at that time all of a blaze to the bulkhead. It was about fifteen or twenty minutes after I first heard of the fire that the life-boat was let go. The life-boat was somewhat burnt before she was thrown over. The next thing I, with the others on the forecastle, did, was to empty the baggage-cars, and attach lines to them, and throw them overboard for any one to save himself that could. Some of those on the forecastle drew water with what buckets we had, and threw it on the fire. I then took the flagstaff and another spar that we had knocked off the bulwarks, and fastened them to those two spars to make a raft to get on to. I threw the raft overboard, and several persons, some two or three, got on to it; but it was not buoyant enough to hold them up. That was all we could do, excepting to throw water, which we did as long as we could. The boat was then nearly burnt to the water's edge, and the forward deck was burnt and had fallen in. We then got cornered up so that we had no chance to throw water, and were obliged to leave the boat to burn. Those left on the forecastle, some eight or ten in number, then asked me what they could do to save themselves. I then told them that I saw no chance; that we had done all that we could do. We then began to get overboard; some hung on to the crates at the forward part of the boat, and some got on to the guard. I got down on to the raft I have before mentioned. I found it sinking under me, and I lifted myself up again by a piece of rope which I had, and which I whipped over a spike. Then I jumped from the raft on to the piece of guard; and from this guard I got on to a bale of cotton. I found a man by the name of McKinney on the bale. After I had got on, a man standing on this piece of guard asked if there was room on the bale of cotton for another man. I made him no answer. He jumped to get on to it, and in doing so knocked off McKinney. I hauled McKinney on to the bale again, and the man returned to the guard. I found the bale was lashed to this piece of guard, and I took my knife and cut away the lashings; I took up a piece of board which was floating by, and shoved the bale clear of the guard, and let it drift down the Sound before the wind. McKinney froze to death about daylight the next morning, and fell off the bale. Between eleven and twelve o'clock the next day, I was picked up by the sloop Merchant, Captain Meeker. When I first heard that the boat was on fire, I had been in the wheel-house, after taking my tea, for about twenty-five or thirty minutes."

On the 10th of February, 1842, the Merchants' Bank filed a libel in the District Court of the United States for the District of Rhode Island, against the New Jersey Steam Navigation

Company, as the owners of the Lexington, for "a cause of bailment, civil and maritime." As the libel is not long, and the circumstances of this case are peculiar, it is deemed proper to insert it.

"To the Honorable John Pitman, Judge of the District Court of the United States within and for the District of Rhode Island.

"The libel and complaint of the President, Directors, and Company of the Merchants' Bank of Boston, a corporation incorporated by the legislature of the Commonwealth of Massachusetts, against the New Jersey Steam Navigation Company, a corporation incorporated by the legislature of the State of New Jersey, owners of the steamboat Lexington, for a cause of bailment, civil and maritime :

"And thereupon the said President, Directors, and Company of the Merchants' Bank of Boston do allege and articulately propound as follows : —

"First. That the respondents, in the month of January, in the year of our Lord one thousand eight hundred and forty, were common carriers of merchandise on the high seas from the city of New York, in the State of New York, to Stonington, in the State of Connecticut, and were then owners of the steamboat Lexington, then lying at the port of New York, in the State of New York, and which vessel was then used by the respondents as common carriers, as aforesaid, for the transportation of goods, wares, and merchandise on the high seas from the said port of New York to the said port of Stonington, in the State of Connecticut.

"Second. That the complainants, on the high seas, and within the ebb and flow of the tide, and within the admiralty and maritime jurisdiction of the United States and of this court, on the thirteenth day of January, A. D. 1840, contracted with the respondents for the transportation, by water, on board of the said steamboat Lexington, from the said port of New York to the said port of Stonington, of certain gold coin, amounting to fourteen thousand dollars, and of certain silver coin, amounting to eleven thousand dollars, to the libellants belonging ; and the said respondents then and there, for a reasonable hire and reward, to be paid by the libellants therefor, contracted with the libellants that they would receive said gold coin and silver coin on board of the said steamboat Lexington, and transport the same therein on the high seas from said New York to said Stonington, and safely deliver the same to the libellants.

"Third. That the libellants, on the said thirteenth day of

January, A. D. 1840, at said New York, delivered to the said respondents on board of the said steamboat Lexington, then lying at said New York, and within the ebb and flow of the tide, and within the admiralty and maritime jurisdiction of the United States and of this court, and the respondents then and there received on board of said steamboat the said gold coin and silver coin, for the purpose of transporting the same by water on the high seas from said New York to said Stonington, and to deliver the same to the libellants as aforesaid.

" Fourth. That the steamboat Lexington sailed from said port of New York, with the said gold coin and silver coin on board, on said thirteenth day of January, A. D. 1840, and bound to said port of Stonington; yet the respondents, their officers, servants, and agents, so carelessly and improperly stowed the said gold coin and silver coin, and the engine, furnace, machinery, furniture, rigging, and equipments of the said steamboat were so imperfect and insufficient, and the said respondents, their officers, servants, and agents, so carelessly, improperly, and negligently managed and conducted the said steamboat Lexington during her said voyage, that, by reason of such improper stowage, imperfect and insufficient engine, furnace, machinery, furniture, rigging, and equipments, and of such careless, improper, and negligent conduct, the said steamboat, together with the said gold coin and silver coin, to the libellants belonging, were destroyed by fire on the high seas, and wholly lost.

" Fifth. That by reason of the destruction of the said steamboat Lexington, and of the said gold coin and silver coin, the libellants have sustained damage to the amount of twenty-five thousand dollars.

" Sixth. That the said New Jersey Steam Navigation Company are possessed of certain personal property within the said Rhode Island district, and within the ebb and flow of the sea, and within the maritime and admiralty jurisdiction of this court, to wit, of the steamboat called the Massachusetts, her tackle, apparel, furniture, and appurtenances, and of other personal property.

" Seventh. That all and singul r the premises are true, and within the admiralty and maritime jurisdiction of this court; in verification whereof, if denied, the libellants crave leave to refer to the depositions and other proof to be by them exhibited in the cause. Wherefore, the libellants pray that process, in due form of law, according to the course of admiralty and of this court in causes of admiralty and maritime jurisdiction, may issue against the respondents, and against the said steamboat Massachusetts, her tackle, apparel, furniture, and appurte-

nances, or any other property to the respondents belonging within the said Rhode Island district; and that the said property, or any part thereof, may be attached and held to enforce the appearance of the respondents in this court, to answer the matters so articulately propounded, and to answer the damages which may be awarded to the libellants for the causes aforesaid; and that this court would be pleased to pronounce for the damages aforesaid, and to decree such damages to the libellants as shall to law and justice appertain."

On the same day, a monition and attachment were issued, directing the steamboat Massachusetts, her tackle, apparel, furniture, and appurtenances, or any other property to the respondents belonging, within the Rhode Island district, to be attached. All of which was done.

In May, 1842, the respondents filed their answer, which is too long to be inserted. The substance of it was, —

1st. They admitted the ownership of the Lexington, and her being used for the transportation of passengers, goods, wares, and merchandise between New York and Stonington.

2d. They denied any contract whatever with the libellants.

3d. They denied that the libellants ever shipped, or that the respondents received from the libellants, any gold and silver coin whatever.

4th. They asserted that whatever goods were received on board the Lexington were received under the advertisements and notices mentioned in a previous part of this statement.

5th. That the usage and custom of the company was to be held responsible for ordinary care and diligence only; and that this usage, being well known to the libellants, constituted a part of the contract of shipment.

6th. That the bill of lading, heretofore mentioned, was a copy of all the bills of lading given by the company, which was well known to the libellants.

7th. That the notice above mentioned was posted up on board the steamboat, and on the wharf, and in the office of the company, of which facts the libellants were informed.

8th. That the Lexington was accidentally destroyed by fire.

9th. They denied that the cotton was improperly stowed; that the engine, machinery, &c., were imperfect and insufficient; that the officers carelessly, improperly, or negligently managed the boat; or that by reason of these things the boat was lost. The contrary of all these things was averred; and they further averred, that they had complied with the requisitions of the act of Congress passed on the 7th of July, 1838.

In verification of this last averment, they filed the inspection certificate, dated on September 23d, 1839.

On the 18th of October, 1842, the District Court pronounced a *pro forma* decree, dismissing the libel with costs, from which an appeal was taken to the Circuit Court.

Under the authority of the Circuit Court, commissions to take testimony were issued, under which a vast mass of evidence was taken on both sides.

The libellants offered evidence to prove the following positions: — that the furnaces were unsafe and insufficient; that there was no proper casing to the steam-chimney, nor any safe lining of the deck where the chimney passed through; that dry pine wood was habitually kept in a very exposed situation; that, especially, there was a very improper stowage or disposition of the cargo on board, considering what that cargo was; that the boat had no tiller chain or rope, such as the act of Congress, as well as common prudence, required; that there were on board no fire-buckets, properly prepared and fitted with heaving-lines; that the fire-engine was in one part of the boat, while the hose belonging to it was kept or left in another, and where it was inaccessible when the fire broke out; and that in other respects the respondents were guilty of negligence the more culpable, as the same boat had actually taken fire in her last preceding voyage, and no measure of caution had been taken to prevent a recurrence of the accident.

The respondents, on the contrary, offered evidence to rebut that adduced in support of the above, and particularly that the boat, hull, engine, boiler, and general equipment were good; that the most experienced men had been employed, without regard to expense, in putting her into complete order; that she had a captain, pilot, and crew equal to all ordinary occasions, and that respondents were not liable if they did not prove fit for emergencies which might appall the stoutest; that the boat was well found in tool-chests; that there were on board a suction-hose, fire-engine, and hose, as required by the act of Congress; that they were stowed in a proper place; that sufficient reasons were shown why they were not available at the fire; that there were three dozen and a half of fire-buckets on board; that the steering apparatus was good; that the loss of the boat did not result from her not having "iron rods and chains" instead of "wheel or tiller-ropes"; that the parting of the wheel-ropes, if occasioned by the fire, did not contribute at all to her loss.

At November term, 1843, the cause came on to be heard before the Circuit Court, when the court pronounced the following decree.

"This cause came on to be heard upon the libel, the answer

30 *

of the respondents, and testimony in the case.   The respondents submitted to a decree.

"Whereupon it is ordered, adjudged, and decreed, that the said libellants have and recover of the said respondents the sum of twenty-two thousand two hundred and twenty-four dollars, and costs of suit, and that execution issue therefor according to the course of the court.".

An appeal from this decree brought the case up to this court.

It was argued by *Mr. Ames* and *Mr. Whipple*, for the plaintiffs in error, and *Mr. R. W. Greene* and *Mr. Webster*, for the defendants.   The arguments extended over a wide field, and it is impossible to give them *in extenso*.   All that can be done will be to place before the reader the leading views of the respective counsel, and the reasons in support of them.

The brief filed by *Mr. Ames* and *Mr. Whipple* appears to contain these views and authorities.   It was as follows.

The libel, after stating that the respondents, as common carriers of merchandise from the city, of New York to Stonington, in the State of Connecticut, were owners of the steamboat Lexington, used by them for carrying on their said business, states, in articles second and third : —

"Second.   That the complainants, on the high seas, and within the ebb and flow of the tide, and within the admiralty and maritime jurisdiction of the United States and of this court, on the 13th day of January, A. D. 1840, contracted with the respondents for the transportation by water, on board of the said steamboat Lexington, from the said port of New York to the said port of Stonington, of certain gold coin amounting to fourteen thousand dollars, and of certain silver coin amounting to eleven thousand dollars, to the libellants belonging ; and the said respondents, then and there, for a reasonable hire and reward, to be paid by the libellants therefor, contracted with the libellants that they would receive said gold and silver coin on board of the said steamboat Lexington, and transport the same therein, on the high seas, from said New York to said Stonington, and safely deliver the same to the libellants.

"Third.   That the libellants, on the said 13th day of January, A. D. 1840, at said New York, delivered to the said respondents, on board of the said steamboat Lexington, then lying at said New York, and within the ebb and flow of the tide, and within the admiralty and maritime jurisdiction of the United States and of this court, and the respondents then and there received on board of said steamboat, the said gold coin and silver coin, for the purpose of transporting the same by

water, on the high seas, from said New York to said Stonington, and to deliver the same to the libellants, as aforesaid."

The libel then proceeds to state the loss of the Lexington, whilst on her voyage from New York to Stonington, on the 13th of January, 1840, and of the gold and silver coin on board, by fire, and attributes the loss to the improper stowage of the gold and silver coin, the imperfect and insufficient engine, furnace, machinery, furniture, rigging, and equipments of the boat, and her careless, improper, and negligent management and conduct by the officers, servants, and agents of the respondents; and by reason thereof claims damages to the amount of twenty-five thousand dollars.

The proceeding is *in personam*, the process being a warrant of attachment and monition, both the attachment and monition being special.

The appellants contend that the decree of the Circuit Court for the Rhode Island district should be reversed, and the libel dismissed, on the following grounds: —

First. That the contract set forth in the libel, and claimed to be proved, and for breach of which damages are sought therein, — to wit, a contract to carry the gold and silver coin of the libellants, in the steamboat of the respondents, from the city of New York to Stonington, in the State of Connecticut, — is not a contract within the admiralty and maritime jurisdiction of the courts of the United States; and hence that this court, sitting as a court of admiralty, has no jurisdiction of this cause.

Second. That, in fact, the libellants did not deliver to the respondents, and the respondents did not receive from the libellants, the said gold and silver coin to carry, but that the contract of the libellants was wholly with one William F. Harnden, a carrier and forwarder on his own account and risk, and as such contracted with and paid by the libellants; and hence, that if the libellants have any cause of action for the loss of their said coin, it is against Harnden, and not against the respondents, there being no privity of contract between the libellants and respondents.

Third. That if, in their own name, which we deny, the libellants could pursue the respondents, it could only be by virtue of and under the contract of Harnden and the respondents, for the transportation on board of the boats of the respondents of Harnden's express crate; and that, by virtue of this contract, Harnden was the insurer of his own crate, whilst on board the respondents' boats, using said boats as his own.

Fourth. That although, under these circumstances, we can-

not be liable for any degree of negligence, or for want of sufficiency in our boat and equipments, to the libellants, with whom we did not contract, and for whom we did not carry, we deny, as a matter of fact, the charge made against us in the libel in this respect, and contend that our boat was stanch and strong, and well equipped, and that her loss by fire was not occasioned by any deficiency in her equipments, or any unskilfulness or negligence in her conduct.

First point. We say that this court, as a court of admiralty, has no jurisdiction of the contract set forth in the libel, — a carrying contract, stated and claimed to have been made in the city and within the body of the county of New York, and to be performed by the respondents by a trip of their boat, in which she passed round the head of New York harbour, up the East River, through a portion of Long Island Sound, to Stonington, *infra fauces terræ*, — land-locked the whole way.

It is well settled that this court will judicially notice geographical facts relating to causes before them. In United States *v.* La Vengeance, 3 Dallas, 297, this court took judicial notice of the position of Sandy Hook. See, too, The Apollon, 9 Wheat. 374. In Steamboat Jefferson, 10 Wheat. 428, and in Peyroux *v.* Howard, 7 Peters, 342, this court took judicial notice of the fact that the tide ebbed and flowed at New Orleans.

The general question of the jurisdiction of the courts of the United States as courts of admiralty, and especially in relation to contracts, has been much discussed ; and we refer the court, for the general learning and argument upon this subject, to the late Judge Winchester's opinion in The Sandwich, 1 Peters's Adm. Dec. 233, note ; Hall's Adm. Prac., Introduction ; and to the opinions of the late Mr. Justice Story, in De Lovio *v.* Boit, 2 Gall. 398, &c., and The Schooner Volunteer, 1 Sumner, 550, in which a very enlarged admiralty jurisdiction is contended for ; and to the very able and critical opinions of Mr. Justice Johnson, late of this court, in Ramsay *v.* Allegre, 12 Wheat. 611 ; and of Mr. Justice Baldwin, late of this court, in Bains *v.* The Schooner James and Catharine, 1 Baldwin, 544 ; and to 1 Kent's Comm. 367 – 377, 5th ed., where a very restricted jurisdiction over contracts is held to have been given to the courts of the United States by the provisions of the Constitution.

Upon this subject, and in relation to the case at bar, we submit to the court the following points and considerations.

The Constitution of the United States provides, article 3, sec. 2, that " the judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States, and the treaties made, or which shall be made,

under their authority ; to all cases affecting ambassadors, other public ministers, and consuls ; to all cases of admiralty and maritime jurisdiction ; to controversies to which the United States shall be a party ; to controversies between two or more States, between citizens of different States, between citizens of the same State claiming lands under grants of different States, and between a State, or the citizens thereof, and foreign states, citizens, or subjects."

By this clause, the judicial power of the United States is to extend to "*all* cases of admiralty and maritime jurisdiction"; and whether, considering the letter of the clause, or the nature of the cases embraced in it, the jurisdiction of the courts of the United States is held to be exclusive. The Sandwich, 1 Peters's Adm. Dec. 233, note (Judge Winchester); Martin *v.* Hunter's Lessee, 1 Wheat. 333; Bains *v.* Schooner James and Catharine, 1 Baldwin, 544; 1 Kent's Comm. 377, 5th ed.

If this jurisdiction be not imperatively exclusive, by force of the Constitution, it may, at least, become exclusive at the option of Congress; and hence the question of its extent becomes greatly interesting, both as to the jurisdiction of the States and of the common law ; or, in other words, to the *right of trial by jury.*

The jurisdiction is given over "*all cases,*" without reference to the citizenship of the parties, which indicates the extent; and it is not given over "all admiralty and maritime cases," but over "all cases of admiralty and maritime *jurisdiction,*" which indicates the limit of the jurisdiction.

The word "jurisdiction" is necessarily used in direct reference to some court, and the reading of the clause, therefore, is, "all cases of which admiralty and maritime courts have been accustomed to exercise jurisdiction"; the words "admiralty" and "maritime" being synonymous, — the one describing the jurisdiction by the name of the court, the other by the nature of the causes tried in it.

The jurisdiction of courts is necessarily a matter of artificial law, dependent upon convenience, circumstances, policy; and is usually parcelled out by positive regulations.

With regard to the Continental maritime courts, and the courts of admiralty in England, this has been especially the case.

Though founded on the customs and usages of the Mediterranean Sea, collected in the Consulat, these customs and usages were adopted and modified to suit the different countries of Europe, by positive regulation, and courts established with jurisdiction and rules of decision marked out by the code of each state or commercial city. Us et Coustumes de la Mer, published at Bordeaux, 1681; Sea Laws, 254 – 256, 376, 377.

Though some matters are within the jurisdiction of all maritime courts, yet it is obvious that on a great variety of subjects the codes differ ; and that there is no universal maritime law fixing with precision the jurisdiction of courts of admiralty or maritime courts.

To what source, then, are we to go to ascertain what cases are committed to the courts of the United States by the terms " cases of admiralty and maritime jurisdiction," used in the Constitution ?

We submit, first, that we are not to go to the codes or laws of France, Spain, Holland, the Hanse Towns, &c., — to countries of the civil law, — to ascertain the meaning of these terms, thus adopting a varying standard of jurisdiction ; but, as in other cases, to the law of the parent country, England, — the country from whence this was settled, and from whence we derive, in general, all our laws and institutions.

Second. That, except as a matter of curious speculation, it is of no importance — to the question before us it is of no importance — to ascertain what was anciently or originally the jurisdiction of the English admiralty ; but that the question is, as a matter of fact, what was it, at earliest, at the settlement of the country, or, latest, at the period of the American Revolution ; and from the course and practice of courts of admiralty in this country, what was understood to be the extent of admiralty jurisdiction at the time of the adoption of the Constitution of the United States, when the words referred to were used in that instrument.

Third. That, to the question before the court, it is of no importance whether, in the struggle between the courts of common law and admiralty, the former, carrying out acts of Parliament, or, by their own inherent power of prohibition to inferior tribunals, transgressing their rightful jurisdiction, restricted the jurisdiction of the English admiralty within narrower limits than it anciently or originally claimed and exercised ; so that, as a matter of fact, it was restricted in its jurisdiction within those limits at the periods above referred to.

Fourth. That it is of no importance to consider the question, whether the terms of the statutes of Richard II. render them applicable, as statutes, to this country ; inasmuch as they, with the decisions under them, formed a part of the law of England, fixed the relative jurisdiction of the courts of admiralty and common law, and had fixed it centuries before the settlement of this country.

We might with much more reason contend, that the royal order of King Edward I. and his lords, and of King Edward III., and of his solemn convocation of judges, which were in-

tended to restrain the courts of common law, or the inferior manorial jurisdictions, were of no binding force upon this country, as invasions of the ancient law of England, than can be contended on the other side, that solemn acts of Parliament, passed so many years ago, are to be disregarded, as showing the ancient state of the English law.

Fifth. That at the settlement of this country, and at the Revolution, it is perfectly notorious that the courts of admiralty in England not only did not exercise, but did not claim to exercise, jurisdiction over such contracts as the one set forth in the libel.

We do not refer to the claims of civilians in their treaties, in which they claimed every thing in general terms. Sea Laws, 208, extracts from Godolphin's View of the Admiral's Jurisdiction.

From such contracts as that set forth in the libel, the courts of admiralty were expressly excluded by the terms of the acts of Richard II., confirmed and explained by the acts of Henry IV. and Elizabeth. See Acts; Sea Laws, 229, 234, 235, and in 6 Vin. Abr. 520, 521.

These acts were plainly and pointedly intended to restrain the jurisdiction of admiralty on waters within the body of a county, and especially within all ports and havens. See Brownlow, part 2, p. 16; Sea Laws, 333. See cases collected in 2 Gall. 429, 447, and 6 Vin. Abr. 523 – 527.

Dr. Browne admits, what some other civilians deny, that ports, creeks, and havens are within the restraining acts of Richard II. and Henry IV., and that the admiralty jurisdiction was excluded from these places by those acts. 2 Browne, Civ. and Adm. Law, 92; 3 Dunlap, 33. See, too, opinion of Sir Chris. Robinson, in The Public Opinion, 2 Haggard, 398.

Indeed, the whole criticism by Judge Story, in De Lovio *v.* Boit, of the decisions under the statutes of Richard, is intended to show rather that they were decided wrongly, than that they did not decide that the admiralty had no jurisdiction over contracts made in ports and havens.

The undoubted doctrine of the common law courts, since these statutes at least, has ever been, that the jurisdiction of admiralty over contracts is confined to contracts made upon the *high* sea, to be executed upon the *high* sea, of matters in their own nature maritime. 2 Gall. 437.

One great point of dispute between the common lawyers and the civilians, in the construction of the statutes of Richard II., was the meaning of the words " things done upon the sea," in stat. 13 Richard II., and " things done and arising within the bodies of counties," in stat. 15 Richard II.

The civilians, and with them agrees Judge Story, contended that the words "things done upon the sea" meant "things done touching the sea"; i. e. maritime affairs and transactions.

They liken these words to the words of the French ordinance of 1400, which gives the admiralty of France "connoissance et jurisdiction *de tous les faits de la mer*," &c., and to the words of the French ordinance quoted by Selden, "pour raison ou occasion de faict de la mer"; that is, Selden says, "ab aliquam causam a re maritima ortam"; and because "tous les faits *de* la mer" means maritime transaction, in the French ordinance, the argument is, that the words "choses faits *sur* la mer" mean the same thing in the English statute. 2 Gall. 439.

Unlike the French admiralty jurisdiction, the English admiralty jurisdiction, over contracts at least, originally depended upon the place where made or transacted; and even, it would seem, upon the occupation of the parties to them. See Order of King Edward I.; 2 Gall. 402, n. 16; Black Book of Admiralty, quoted by Judge Story, 2 Gall. 405.

Sixth. That, as a matter of fact, the courts of admiralty in this country, previous to the adoption of the Constitution of the United States, so far as their decisions have been considered of value enough to be published, never did exercise jurisdiction over contracts of the character of that set forth in the libel, but held themselves confined to the limits of the jurisdiction of the English courts of admiralty. Clinton *v.* Brig Hannah, Bee's Adm. R. 419, decided by Judge Hopkinson in 1781 · Shrewsbury *v.* Sloop Two Friends, Bee's Adm. R. 435, decided by Judge Bee in 1786. See also The Brig Eagle, Bee, 78, and Pritchard *v.* The Lady Horatia, Bee, 168, the former decided in 1796, and the latter in 1800, after the adoption of the Constitution; in the latter of which, the ground of the jurisdiction of the court in the case before it is noticed, and the English cases relied on and reviewed.

Seventh. The terms of the commissions of courts of vice-admiralty in this country, in former times, and of the judges of admiralty in England, afford no index to the true limits of their jurisdiction. They were mere matters of form, and Lord Stowell, speaking of his own commission as judge of the High Court of Admiralty, says, — "It is universally known, that a great part of the powers given by that commission are totally inoperative." The Apollo, 1. Haggard's Adm. R. 312, 313. See, too, Schooner Volunteer, 1 Sumner, 564, 565.

Eighth. No case has yet been decided by the Supreme Court of the United States, affirming the admiralty jurisdiction of the court over a contract of this character.

The decisions of the Supreme Court upon the subject of their admiralty jurisdiction may be arranged in four classes:—

1. Cases of material men, proceeding *in rem*, for repairs done or materials furnished.

The General Smith, 4 Wheat. 438, was the case of a material man proceeding *in rem* in the domestic port of the ship. The libel was dismissed upon the ground, that upon a ship, in a domestic port, the maritime law gave no lien for materials found, &c., the credit being personal; and hence, that the proceeding *in rem* could not be maintained. See the *obiter dictum* of Mr. Justice Story in this case, in substance, that, if the libel had been *in personam*, it would have been sustained; commented on by Mr. Justice Johnson in Ramsay *v.* Allegre, 12 Wheat. 611.

The case of Peyroux *v.* Howard, 7 Peters, 324, was a libel *in rem* against a domestic vessel in the port of New Orleans, brought by a material man, to enforce a lien given by the local law of Louisiana in such cases.

These decisions conform to the decisions of Clinton *v.* Brig Hannah, Shrewsbury *v.* Sloop Two Friends, and Pritchard *v.* The Lady Horatia, before cited from Bee, which suppose that the remedy in admiralty depends upon the fact of a lien.

The third resolution of the agreement of February 4th, 1632, between the judges of the King's Court of Westminster and the judge of the Court of Admiralty and the attorney-general, concerning the jurisdiction of the English admiralty, was in these words:—

"If suit be in the Court of Admiralty for building, amending, saving, or necessary victualling of a ship, against the ship itself, and not against any party by name, but such as, for his interest, makes himself a party, no prohibition is to be granted, though they be done within the realm." Dunlap's Adm. Prac. 14; Hall's Adm. Prac. 24, 25, Introduction.

In the time of Charles I., it seems that the English admiralty had jurisdiction to enforce a lien in favor of material men, by a proceeding *in rem*. 6 Vin. Abr. 527.

2. Cases of possessory, and, perhaps, petitory suits concerning vessels.

The case of the Steamboat Orleans *v.* Phœbus, 11 Peters, 175, 184, was a libel *in rem*, in the nature of a possessory suit, brought by one part-owner of a vessel against the others, praying that the vessel might be sold, and he paid his advances and freight in account with the other part-owners, and his proportion of the proceeds of the sale. The court below, strangely enough, decreed an account and sale. It being shown that the boat was employed in plying between New Orleans and Mays-

ville, on the Ohio River, — i. e. her substantial employment being in waters without the ebb and flow of the tide, though she touched waters where the tide ebbed and flowed at one terminus of her trips, New Orleans, — the libel was dismissed by this court for want of jurisdiction.

Undoubtedly, had her substantial employment been on waters where the tide ebbed and flowed, the court would have entertained the suit so far as to decree a stipulation in favor of the part-owner, for his security, though the account and sale were out of the course of admiralty.

Possessory suits, in relation to vessels, have always been entertained by the English Courts of Admiralty without prohibition.

"Until some time after the Restoration," says Lord Stowel, "the courts of admiralty exercised jurisdiction over petitory suits, when it was found by other courts that it belonged exclusively to them; since which it has been very cautious not to interfere at all in questions of this sort." The Aurora, 3 Rob. 133, 136.

Pursuing the same subject in the case of The Warrior, 2 Dodson, 288, he reaffirms the above in regard to petitory suits, and adds : — "The jurisdiction over causes of possession was still retained; and although the higher tribunals of the country denied the right of this court to interfere in mere questions of disputed titles, no insinuation was ever given by them that the court must abandon its jurisdiction over causes of possession." See, too, 2 Browne's Civ. and Adm. Law, 113, 114, 397; Dunlap's Adm. Prac. 24, 29, 30.

3. Cases of mariners' wages.

The Steamboat Jefferson, 10 Wheat. 429, was a libel *in rem* for wages earned on board a steamboat plying between Shippingport, in Kentucky, and places up the Missouri River, which was dismissed by this court for want of jurisdiction over the contract, as one not relating to service performed on waters in which the tide ebbed and flowed.

If the service had been substantially performed on tide-waters, the admiralty would have had jurisdiction; such contracts being within the acknowledged jurisdiction of the English admiralty. 2 Browne's Civ. and Adm. Law, 36, 37; Dunlap, 26, 27.

4. Cases of salvage.

Hobart et al. *v.* Drogan et al., 10 Peters, 108, 119, 120, 121, was a case of salvage.

Salvage has always been deemed within the jurisdiction of the English admiralty. See the case of The Joseph Harvey, 1 Rob. 306, in which Sir William Scott says, — "It is allowed

that the court may, in case of pilotage as well as salvage, direct a proper remuneration to be made."

Andrews *v.* Wall, 3 Howard, 568, was also a case of salvage, the proceeds being in possession of the court, and ordered to be distributed according to an agreement of consortship between the salvors. As his Honor, Judge Story, observed, in delivering the opinion of the court, it has always been held in the English admiralty, as incidental to the jurisdiction of the court over the subject of salvage, that the court has power to entertain supplementary suits in relation to the proceeds in their possession, and to order them to be paid over to the parties interested according to their right.

Ninth. We know of no case, out of the first circuit, in which the jurisdiction of the court in admiralty over such a contract as this has been affirmed.

The Sloop Mary, 1 Paine, 671, was a libel to enforce a bottomry bond, executed by the owner and master in the West Indies, to enable him to purchase a cargo. One question was, whether the case was within the admiralty jurisdiction of the court, the bond being made by the owner as owner of the vessel, since as master he could not have made such a bond for the mere purchase of cargo, but only for necessary supplies and repairs. The court sustained their jurisdiction, upon the ground that this was a maritime contract, the vessel being hypothecated for the payment of the sum loaned, and the payment being contingent upon the safe arrival of the vessel.

In Wilmer *v.* Smilax, 2 Peters's Adm. Dec. 295, the District Court of Maryland sustained jurisdiction of a libel on a bottomry deed executed by the owner in a home port. This is going farther than this court has intimated it felt authorized to go. 4 Cranch, 328.

That the English admiralty has always had undisputed jurisdiction over bottomry bonds, and of all contingent hypothecations of cargo and freight, is well settled; the jurisdiction depending, not upon the consideration of the contract, but upon whether the payment be contingent upon the arrival of the vessel. The Barbara, 4 Rob. 1; The Zodiac, 1 Haggard, 325; The Atlas, 2 Haggard, 48; The Murphy, 2 Browne's Civil and Adm. Law, 530; Dunlap's Adm. Prac. 27, 28.

Second point. That, in fact, the libellants did not deliver to the respondents, and the respondents did not receive from the libellants, the said gold and silver coin to carry, but that the contract of the libellants was wholly with one Wm. F. Harnden, a carrier and forwarder on his own account and risk, and as such contracted with and paid by the libellants; and hence, that if the libellants have any cause of action for the

loss of said coin, it is against Harnden, and not against the respondents, there being no privity of contract between the libellants and respondents.

Harnden was the collector of drafts, &c., for the Merchants' Bank, in the city of New York, and carrier of the specie in question.

His business was that of a carrier and forwarder of specie, small packages, &c., collector of drafts, purchaser of goods, &c., carried on in offices kept by him in New York and Boston, and how he did his business as a carrier is proved by Harnden, 118, 121; Lockwood, 102, 105.

His mode of carrying between New York and Stonington is shown by his agreements with the respondents, owners of boats plying between those places.

The agreement of August, 1839, provides, "that the said William F. Harnden, for and in consideration of the sum of $250 per month, to be paid monthly to the said New Jersey Steam Navigation Company, is to have the privilege of transporting in the steamers of said company, between New York and Providence, via Newport and Stonington, not to exceed once in each day, from New York and from Providence, and as less frequently as the boats may run between and from said places, one wooden crate, of the dimensions of five feet by five feet in width and height, and six feet in length (contents unknown), until the 31st December, A. D. 1839, and from this date.

"The following conditions are stipulated and agreed to, as part of this contract, to wit : — The said crate, with its contents, is to be at all times exclusively at the risk of the said William F. Harnden ; and the New Jersey Steam Navigation Company will not, in any event, be r sponsibl , either to him or his employers, for the loss of any goods, wales, merchandise, money, notes, bills, evidences of debt, or property of any and every description, to be conveyed or transported by him in said crate, or otherwise, in any manner, on the boats of said company.

"Further, that the said Harnden is to attach to his advertisements, to be inserted in the public prints, as a common carrier, exclusively responsible for his acts and doings, the following notice, which he is also to attach to his receipts or bills of lading, to be given in all cases for goods, wares, and merchandise, and other property committed to his charge, to be transported in said crate or otherwise :

" 'Take notice. — William F. Harnden is alone responsible for the loss or injury of any articles or property committed to his care ; nor is any risk assumed by, nor can any be attached to,

the proprietors of the steamboats in which his crate may be, and is transported, in respect to it or its contents, at any time.' " Schedule I, printed rec. 128. Harnden applies for renewal of contract, by letter, of date Boston, December 7, 1839, schedule I, printed rec. 129; Handy replies, by letter, of date New York, December 9, 1839, schedule K, printed rec. 130; Harnden's letter, of date Boston, December 16, 1839, schedule L, printed rec. 130; Handy's letter, of date New York, December 31, 1839, schedule M, printed rec. 130, 131. To this Harnden makes no reply, waiting until he came to New York, Harnden's deposition, printed rec. 121, answer to third cross-interrogatory. He was kept back by bad weather (Lockwood's deposition, printed rec. 104, answer to twenty-second interrogatory); but under same contract, with same advertisements, continues to transport his crate in the boats of the New Jersey Steam Navigation Company, as before; and on coming to New York, on the 24th of February, 1840, formally renews the contract as proposed by Handy in his letter of December 31, 1839. During the interval between the date of this letter and the 24th of February, 1840, the Lexington was lost. See Harnden's deposition, 120; Brigham's, 28, answers to first, second, third, and fourth cross-interrogatories; ib. 141; Lockwood's, 104, twenty-third interrogatory; schedule N, printed rec. 131, 132. Harnden had acted as carrier for the bank before this transaction. Harnden's deposition, 120, answers to thirteenth, seventeenth, and eighteenth interrogatories, and to tenth cross-interrogatory.

He was not our agent, but did business for himself. They employed him, and not us, and were bound to know in what character he acted; the presumption being, that he who is employed is alone responsible for his acts and contracts.

The burden is upon the libellants to show that Harnden's acts and contracts bind us, he doing business as a carrier, on his own account, in fact and appearance.

We are not bound, therefore, to bring home to the libellants knowledge of the terms of his contract with us; and his notices of these terms are not our notices, but his own; stipulated for, it is true, in our contract with him, *ex abundanti cautela,* but our exemption from responsibility coming from our relation to Harnden and our contract with him, and not from the fact that his notices were brought home to his employers.

But the Merchants' Bank actually knew that Harnden did business for himself, and was alone to be responsible. He distributed ten thousand notices to that effect, and especially sent them to the Boston banks. Harnden's deposition, 119, answers to fourth, fifth, sixth, seventh, eighth, and ninth inter-

31 *

rogatories, page 121, answer 121; answer to tenth cross-interrogatory.

He advertised to that effect in the Boston newspapers, some of which this bank took. Curtis's deposition, 153; Champney's, 153; Nichols's, 154; advertisement, 155; Conant's, 153 155.

Harnden was not the agent of the Merchants' Bank to ship their coin with us. He was their agent to collect their drafts in New York, but their carrier to transport the proceeds to them at Boston. He used our boats under general express arrangements, for the carrying on of his own business, made between him and ourselves, by which both are bound, and which necessarily excluded all tacit agreements between us and his customers.

We carried Harnden's crate for him, — not its contents for his employers. We are, therefore, no carriers for the Merchants' Bank; there is no contract — no privity of contract — between them and us.

Hence, we cannot be liable to the Merchants' Bank; but, if at all, only to Harnden, on our contract with him. Reynolds v. Toppan, 15 Mass. Rep. 370; King v. Lenox, 19 Johns. 235, 236; Walter v. Brewer, 11 Mass. Rep. 99; Ward v. Green, 6 Cowen, 173; Allen v. Sewall, 2 Wendell, 327; S. C. in error, 6 ib. 335; Halsey v. Brown, 3 Day, 346; Portugal coin case, Abbott on Ship. 119; Cas. Temp. Hardw. 85, 194; Butler v. Basing, 2 Car. & Payne, 613; Citizens' Bank v. Nantucket Steamboat Company, 2 Story, 32 – 34, 46.

Again, in case of valuables, as jewels and precious stones, gold and silver coin, carried either by land or sea, it not being the custom of the carrier to carry such things without a special acceptance, he shall not be liable for their loss, unless he accepts them and is paid for them. Kenrig v. Eggleston, Aleyn, 93; commented on by Lord Mansfield, in Gibbon v. Paynton, 4 Burr. 2301. Cases of baggage decided by Lord Holt, and collected in 1 Vin. Abr. 220; and see 1 Wheat. Selwyn, 301, No. 1, and cases cited. Orange County Bank v. Brown et al., 9 Wend. 85; Pardee v. Drew, 25 ib. 459; Citizens' Bank v. Nantucket Steamboat Company, 2 Story, 32 – 34, 46; Statutes 11 Geo. 4, and 1 Wm. 4, ch. 38, 68, found in 2 Kent's Comm. 609, note c; 2 Stephens's N. P., art. Carrier, in relation to land-carriers. Statutes 7 Geo. 2, ch. 15; 26 Geo. 3. ch. 86; 53 Geo. 3, ch. 159, found in 2 Kent's Comm. 606. Abbott on Shipping, part 3, ch. 4, sect. 8, 9, and in chap. 5, on Limitation of Responsibility of Ship-owners. See Hinton v. Dibbin, 2 Adol. & Ell. (N. S.) 646, reviewing obiter dicta in Boys v. Pink, 8 Car. & Payne, 361, and in Owen v. Burnett, 2 Cromp.

& Mees. 353 ; S. C., 4 Tyrwhitt, 133, in construction of statutes 11 Geo. 4 and 1 Wm. 4, ch. 68.

We neither received, were paid for, nor carried, with our knowledge, the gold and silver coin of the Merchants' Bank.

The warranty of sufficiency of boat, equipments, &c., is implied in the contract of carriage in favor of him whose goods are contracted to be carried. It follows, that, if we did not contract to carry for the Merchants' Bank, we did not warrant the sufficiency of our means of carriage to them.

Third point. That if in their own name, which we deny, the libellants could pursue the respondents, it could only be by virtue of and under the contract of Harnden and the respondents for the transportation on board of the boats of the respondents of Harnden's express crate ; and that, by virtue of this contract, Harnden was the insurer of his own crate whilst on board the respondents' boats, using said boats as his own.

The contract between Harnden, by its terms, throws the whole risk of the carriage of his crate and contents exclusively on him, — in *any* event, at *any* time. No policy forbids such a contract.

In England it is well settled that a carrier may limit his responsibility by a special acceptance. Kenrig *v.* Eggleston, Aleyn, 93 ; Rolles, Ch. J., Southcote's case, 4 Coke, Rep. 84 ; Coke, Ch. J., Slue *v.* Morse, 1 Vent. 190, 288 ; Hale, Ch. J., Lyon *v.* Mells, 1 Smith, 484 ; S. C., 5 East, 428 ; Abbott on Ship., part 3, ch. 4, sec. 8, p. 296, ed. 1822.

See old and new form of bill of lading. Abbott on Ship., part 3, ch. 2, sec. 3, p. 216, ed. 1829 ; 1 Bell's Comm. 454, 471, 4th ed. ; Gibbon *v.* Paynton, 4 Burr. 2301 ; see Yates, J., Peake's N. P. Cases, 150 ; 2 Taunt. 271 ; 1 Bell's Comm. 380, 384, 4th ed., book 1, part 1, ch. 4, sec. 3, *American Bills of Lading ;* see Gordon *v.* Buchanan, 5 Yerger, 71 ; Johnson *v.* Friar, 4 ib. 48 ; Atwood *v.* Reliance Transp. Co., 9 Watts, 87 ; Relf *v.* Rapp, 3 Serg. & Watts, 35.

It is well settled in England, that a common carrier may limit his responsibility by notices brought home to the knowledge of his customers. Nicholson *v.* Willan, 5 East, 513 ; Gibbon *v.* Paynton, 4 Burr. 2301 ; Yates, J., and Aston, J., Evans *v.* Soule, 2 M. & S. 1 ; Latham *v.* Ratley, 2 B. & C. 20 ; Harry *v.* Packwood, 2 Taunt. 264 ; Leeson *v.* Holt, 1 Starkie, 186 ; Mawing *v.* Todd, ib. 72 ; Lowe *v.* Booth, 13 Price, 329 ; Riley *v.* Horne, 5 Bingh. 217 ; Brooke *v.* Pickwick, 4 Bingh. 218.

The same doctrine prevails in America. Gordon *v.* Little, 8 Serg. & Rawle, 533 ; Atwood *v.* Reliance Transp. Co., 9 Watts, 87 ; Orange County Bank *v.* Brown, 9 Wend. 115, Nelson, J. ; Phillips *v.* Earle, 8 Pick. 182 ; Bean *v.* Green, 3 Fairf. 422.

As to the extent of a carrier's liability under such notices. Smith v. Horne, 8 Taunt. 144; Lowe v. Booth, 13 Price, 329; Brooke v. Pickwick, 4 Bingh. 218; Owen v. Burnett, 2 Cromp. & Mees. 360; Wyld v. Pickford, 8 Mees. & Wels. 443.

By special contract a carrier may dispense with all responsibility; and, in this respect, a special agreement differs from notice. 1 Bell's Comm. 380 – 384, 4th ed., book 1, part 1, ch. 4, sect. 2.

The cases of Cole v. Goodwin, 19 Wend. 280, Nowlen v. Hollister, ib. 246, 247, Clark v. Faxton, 21 ib. 153, and Gould v. Hill, 2 Hill, 623, are cases of lost baggage of passengers or goods carried by land. See Schieffelin v. Harvey, 6 Johns. 180; McArthur v. Sears, 21 Wend. 194; which show that, as common carriers by water, under a contract for the carriage of goods, and especially valuables, deliberately made, we should be entitled to the benefit of the terms of our special agreement with Harnden, under which the libellants must claim, if at all. See 2 Kent's Comm. 601, 608.

But we were not common carriers of this crate and its contents. A common carrier as to some things is not necessarily a common carrier as to others. Citizens' Bank v. Nantucket Steamboat Co., 2 Story, 32 – 34, 46, &c.

The agreement between us, as the owners of steamboats, and Harnden, a carrier, was a permanent arrangement, by virtue of which he was to have the privilege of sending his crate by our boats, and to carry on his business in our boats.

This he could not exact of us as a common carrier for him, and we did not perform as a common carrier. Story on Bailments, 512, § 508; ibid. 483, § 476; Jencks v. Coleman, 2 Sumner, 224, 225; Story on Bailments, 581 – 583, § 591, a, 583, n. 1; 1 Vin. Abr. 220, and cases cited.

In New York it is perfectly well settled that any other bailees, except common carriers, may make what contracts, and provide for what limitations of responsibility, they will, and the courts will fairly carry out the contract. Alexander v. Greene, 3 Hill, 1; 2 Kent's Comm. 608, note a.

In New York a bailee, under such a contract as that between Harnden and ourselves, is liable only for fraud. Ibid.

It is like a case of charter-party, in which the charter-party settles the responsibilities of the parties to it. Abbott on Ship., part 3, ch. 1, Contract of Affreightment.

Fourth point. That, although under these circumstances we cannot be liable for any degree of negligence, or for want of sufficiency in our boat and equipments, to the libellants, with whom we did not contract, and for whom we did not carry, nor to Harnden for any misconduct short of fraud or wil-

ful injury, yet we deny, as a matter of fact, the charge made against us in this respect, and contend that our boat was stanch and strong, and well equipped, and that her loss by fire was not occasioned by any deficiency in her equipments, or any unskilfulness or negligence in her conduct.

Admitting that we could be liable to them on this ground, the burden, as in case of every other breach of contract, is upon him who alleges and claims for a breach, — the libellants here.    They must prove, —

1st.  The insufficiency, &c.

2d.  That their loss was caused by that insufficiency, and not merely its abstract existence.   1 Bell's Comm. 460, 4th ed., book 3, part 1, ch. 5, sec. 2, paragraph 499, L. B. 3.; Pothier, Chartre Partie, vol. 1, p. 319 ; Havelock *v.* Geddes, 10 East, 555 ; Sharp *v.* Grey, 9 Bingh. 459 ; Alderson, J., Bremmer *v.* Williams, 1 Car. & Payne, 414 ; Best, J., Jones *v.* Boyce, 1 Starkie, 495 ; Bell *v.* Reed, 4 Binney, 127 ; Hart *v.* Allen, 2 Whart. 120 ; Reed *v.* Dick, 8 Watts, 479 ; Amies *v.* Stevens, 1 Stra. 128.

The question has been, whether a carrier is ever liable for a *secret* defect.    Pothier, Chartre Partie, vol. 1, p. 319 ; Sharp *v.* Grey, 9 Bingh. 459 ; Alderson, J., Christie *v.* Griggs, 2 Camp. 81 ; Bremmer *v.* Williams, 1 Car. & Payne, 414 ; Story on Bailments, §§ 509, 562, 571, *a*, 592, and authorities cited.

However this may be, as a general question, we contend that, under a contract by which all risk was excluded from us, we are not to be liable for secret defects in our boats, machinery, &c.

Our boat, hull, engine, boiler, and general equipment were good, by the proof.    (Here the counsel entered into a minute examination of the testimony.)

The act of 1838 is a penal act, imposing new duties upon carriers, and does not apply to a boat engaged in the waters in which the Lexington was employed, when lost, but only to boats voyaging " at sea," or in the specified larger lakes.    See 8th and 9th sections of the act of 1838.

Compare the 8th and 9th sections of the act with the 3d, 4th, 5th, and 6th sections, and it will be seen that the word " sea," in the act, does not mean " bay, river, or other navigable waters of the United States," but " *altum mare*," " high or open sea," in the common sense of the term.

But, finally, the loss of the Lexington did not result from her not having " iron rods and chains," instead of " wheel or tiller ropes," required by the statute.

The boat, when found to be on fire, should have been stopped ; and this seems to have been the captain's attempt, at one

time. The parting of the wheel-ropes, if occasioned by the fire, did not contribute at all to her loss.

The want of the steering apparatus required by the statute, not being the cause of her loss, is no ground for damages, within the authorities above cited.

*Mr. R. W. Greene*, for the defendants in error, argued the question of jurisdiction first, and then the following points : —

1. That the respondents were common carriers.

2. That common carriers are liable for all losses, except those which arise from the act of God, the public enemies, or the fault of the owner of the goods.

3. That common carriers cannot limit their liabilities by notice.

4. That even a special agreement to exempt a common carrier from the legal liabilities of his employment would be void. One cannot be a common carrier, receiving the compensation of common carriers, and yet be exempted or excused from the proper responsibilities of his employment.

5. That if there be any doubt of the correctness of the foregoing propositions, according to the law of England or other countries, there is none according to the law of New York, where the shipment in this case was made.

6. But if the libellants be wrong on the general point (viz. that common carriers cannot, in New York at least, limit their responsibility at all by notice), still the effect of notice, if any effect whatever be given to it, can only be to relieve the carrier from liability for *extraordinary* losses or occurrences. He is still liable for losses within his own warranty, express or implied, or occasioned by his own negligence or misconduct.

The libellants contend, therefore,

7. That there is no sufficient proof of notice in this case ; and, —

8. That if notice be proved, it does not relieve the respondents from their implied warranty with regard to the vessel, her seaworthiness, her equipment, the competency of her crew and commander, the mode of stowing cargo, and the navigation and general management of her as a carrying vessel.

And the libellants will maintain, as a rule of evidence fit to govern this case, that if a vessel be lost in fair weather, without the presence of any external cause or occurrence adequate to the production of the loss, the legal presumption is that she was either unseaworthy or was improperly navigated. conducted, or managed ; and to discharge the respondents, this presumption must be met, answered, and overthrown, by clear and satisfactory proof.

The libellants contend that there is in the case no such clear and satisfactory proof as is sufficient to overcome the legal presumption; and they insist, further, that there is proof that, in point of fact, the respondents' warranty was not complied with in various respects, and among others in these, viz. : — that the furnaces were unsafe and insufficient; that there was no proper casing to the steam-chimney, nor any safe lining of the deck where the chimney passed through; that dry pine wood was habitually kept in a very exposed situation; that, especially, there was a very improper stowage or disposition of the cargo on board, considering what that cargo was; that the boat had no tiller chain or rope, such as the act of Congress as well as common prudence required; that there were on board no fire-buckets, properly prepared and fitted with heaving-lines; that the fire-engine was in one part of the boat, while the hose belonging to it was kept or left in another, and where it was inaccessible when the fire broke out; and that in other respects the respondents were guilty of negligence, the more culpable, as the same boat had actually taken fire in her last preceding voyage, and no measure of caution had been taken to prevent a recurrence of the accident.

1st point. As to the question of jurisdiction.

The counsel upon the other side have argued this question as if it were the decision of the court which vested the jurisdiction in it, immediately under the Constitution, without the intervention of an act of Congress, and that if the court were to decide with us, the jurisdiction must remain in its full extent until an alteration of the Constitution. But the Constitution vests in Congress the power to distribute this jurisdiction amongst the courts of the United States, as the public good may require. The courts only take what Congress confers. Congress may confer a jurisdiction as large as the grant contained in the Constitution, as they have done in the Judiciary Act of 1789; or they may abridge and restrict the jurisdiction within such limits as they think proper. They may enact the statutes of Richard, with my Lord Coke's construction. They may even take away the jurisdiction over seamen's wages and bottomry bonds. Congress can also regulate the forms of process and the modes of proceeding in the courts of admiralty, and can provide for the trial by jury of all issues.

Upon such a construction of the grant, the people retain the whole subject under their own control, to be regulated as experience and the progress of events may render expedient. If they find it too large under the Judiciary Act of 1789, they can limit it; if they prefer that the remedy should be confined to cases in rem, they can so restrict it; if they wish a process in personam as well as in rem, they can leave the law as it is.

Whereas, by the construction contended for by our adversaries, the court are urged to disable Congress, and the people through Congress, from conferring such jurisdiction as their interests may require.   The statutes of Richard, with my Lord Coke's construction of them, become a part of the Constitution of the United States, and impose upon the people and Congress a perpetual disability to enlarge the jurisdiction, however much their interests may require it, without an alteration of the Constitution.   The members of the Convention were statesmen, civilians, and common lawyers ; they were engaged in framing an instrument of government, which they hoped, and which we hope, will endure for ages.   The great objects of the confederacy were commerce and union.   Is it not absurd to suppose that men, engaged in such a work, would have incorporated into the compact of government such distinctions as to remedies *in rem* and *in personam* as are contended for by the counsel for the respondents ?   Would they not have conferred the larger power upon Congress, and thus left the subject to be regulated as experience should show was most expedient ?

It is said, however, in answer to this, that, if the court should now decide that it does not possess the jurisdiction, Congress can hereafter enlarge the jurisdiction.   But the present grant is coextensive with the grant of power to Congress itself in the Constitution.   The words used are the same in both instruments.   If, then, Congress have already exhausted their power by vesting the courts with the whole of it, how can any fund remain in reserve upon which Congress can draw for a fresh supply ?

But it is contended, by the counsel upon the other side, that the English system of admiralty, as it existed in 1787, became bodily transferred, just as it then stood, into the Constitution of the United States.   Without inquiring, for the present, into the absurd, contradictory, and inconsistent principles upon which the common lawyers of England had placed the system, let us examine how far it would be suitable and appropriate to the United States, — how far it would be adapted to our condition, and adequate to carry out one of the great objects for which the people adopted the Constitution.   This object was to promote commerce.   The preamble indicates this.   The United States was a maritime nation, with an immense extent of sea-coast, indented with bays, rivers, and harbours, the navigation of which was dangerous.   A few considerations will serve to show that the limited construction contended for by the other side would eminently fail in promoting this essential object of the union.

As to pilotage.

The English admiralty had no jurisdiction over pilotage, except upon the high seas, where it was not needed.

(*Mr. Greene* here illustrated the necessity of the supervision of the federal government over the subject of pilotage, because of its importance, its peculiar applicability to admiralty jurisdiction, the meritorious character of the services rendered, &c., &c.; also over the subject of material men, inasmuch as the States were foreign to each other as to jurisdiction; also over the subject of salvage, inasmuch as the English admiralty had jurisdiction over salvage only where the property of the ship wrecked was not cast ashore; see 5 Howard, 452; also over the subject of collisions in bays, harbours, and navigable rivers, which are purely a maritime subject, and more apt to occur than collisions on the high seas.)

The subject of affreightment is not within the admiralty jurisdiction of England, although the subject of seamen's wages is so. But freight is the mother of wages. The whole subject of affreightment is purely maritime, and within the jurisdiction of all the Continental courts, and of Scotland, to this day. 1 Sumner, 555, 558, 559.

What are the history and principles of English admiralty jurisdiction, as settled by the common law courts? The principle is, that if a contract be made upon land, to be performed upon the sea, or made upon the sea, to be performed upon land, the courts of admiralty have no jurisdiction. But they can only interfere where contracts are made upon the sea, to be performed upon the sea, — such as a note of hand, given at sea, to be paid at sea, or an agreement to convey real estate, to be executed upon the voyage. Lord Kenyon admitted this to be absurd. In 3 T. R. 267, he says, — "If the admiralty have jurisdiction over the subject-matter, to say that it is necessary for the parties to go upon the sea, in order to execute the instrument, borders upon absurdity." The common law, as to all other than maritime contracts, is, that the law of the place of performance is to govern; but this rule is set aside as to admiralty. The general rule which governs all courts, as to their jurisdiction, is the subject-matter. This is the rule in chancery, in the ecclesiastical courts, and the common law courts, upon every branch of jurisdiction except the admiralty; and in that case alone the inquiry is, not whether the contract be of a maritime nature, but whether it was made within the body of a county. The statutes of Richard are relied upon for this rule, and these statutes are declared by Lord Coke to be in affirmance of the common law. From whatever source this rule of jurisdiction was derived, — whether from the statutes

of Richard or from the common law; — if it be an arbitrary rule, and not founded in any just principle, it is unreasonable to suppose that the people of the United States meant to make it a part of their federal compact. But neither the common law nor the statutes of Richard are justly chargeable with this absurd rule of jurisdiction. It rests entirely upon the authority of Lord Coke, who was a great common lawyer, but no civilian.

(*Mr. Greene* then cited the ancient commissions in admiralty, the ordinance of Edward I., confirmed by ordinance of Edward III., the statutes of Richard II. and Henry IV., to show that the object of all of them was to place the admiralty jurisdiction in the same position where Edward III. had placed it, which did not justify the rule in question.)

The history of Lord Coke's controversy with Lord Chancellor Ellesmere shows the extent to which he desired to push the exclusive jurisdiction of the courts of common law. 3 Bl. Comm. 44. Lord Coke's enmity to the admiralty has been a subject of comment by the common law judges in later times, particularly by Mr. Justice Buller; but they were bound by the authority of his decisions, however much they may have condemned the principle on which they were founded. And now, at this late day, this court are called upon to incorporate these decisions into the American Constitution, and thus deprive the American people of the power, through their representatives in Congress, so to regulate this jurisdiction as their interests may require.

The preservation of the trial by jury is said to be the great object for which these decisions were made. It was alleged that the admiralty had no trial by jury, that the judge was the immediate representative of the crown, and that the subject had no participation in the proceedings of his court. This was very plausible in England, but it has no application to this country; and even in England itself the reason is not sound. If the trial by jury be of such importance as to exclude the admiralty jurisdiction from certain classes of cases of a maritime character, why is the jurisdiction of the Lord Chancellor allowed in that country? His jurisdiction extends over the whole kingdom, and controls and annuls the judgments of the common law courts. He is the immediate adviser of the king, and keeper of his conscience. He is a member of the Privy Council, a politician, appointed and removed as his party succeeds or falls. There is no jury trial in his court, except at his discretion; and he never orders an issue to be tried before a jury, except when the evidence is so doubtful that he can come to no satisfactory conclusion, and he then

puts upon a jury the responsibility of guessing. The United States courts are invested by the Constitution with this power, and they exercise it, sitting as circuit courts in the different States.

How have the common law courts of England extended their own jurisdiction, whilst so scrupulous respecting that of others? The venue was originally local in cases of contracts and personal torts, as well as in real actions. The jury must come from the vicinage; and therefore, where the transaction occurred at sea, no jury could try the case. But a *videlicet* gave to these courts jurisdiction over the ocean, and the defendant was not allowed to deny the fiction. This was, in fact, an encroachment upon the admiralty. The Court of King's Bench had originally no jurisdiction over contracts, but was confined to cases of trespass. But a fiction which was not permitted to be denied gave jurisdiction over matters of contract, and a similar fiction enlarged the jurisdiction of the Court of Exchequer also.

Two arguments are urged against the jurisdiction over the present case : —

1st. It takes away the trial by jury.

2d. It encroaches upon the jurisdiction of the State tribunals.

1st. It takes away the trial by jury.

Nothing can be clearer than that our ancestors attached a high value to the right of trial by jury. But there is a wide difference between an English admiralty judge and one appointed under the Constitution of the United States. The reasons for entertaining a jealousy against the former do not apply to the latter. In the United States, admiralty judges, as well as common law judges, are appointed by and responsible to the people, in some form or other. There is, therefore, no political reason for restraining the jurisdiction of a court of admiralty. If our American ancestors were jealous of the jurisdiction of the vice-admiralty courts of the colonies, the reason for that jealousy ceased when we became an independent people. A vice-admiralty judge of the colonies was the representative of the crown; the people of the colonies had no voice nor participation in his proceedings. It was a foreign tribunal, enforcing, amongst other things, the obnoxious laws of trade. But when the people of the United States came to frame a government for themselves, and to establish a judiciary which should be ultimately responsible to them, nothing can more clearly show how well the Convention and Congress understood their change of position, than the insertion into the Judiciary Act of 1789 of the clause which makes seizures upon tide-wa-

ter, for breaches of the revenue laws, cognizable in the courts of the United States, as courts of admiralty. No trial by jury was provided. This branch of the vice-admiralty jurisdiction was most bitterly complained of by the colonies; and yet the first Congress which sat under the Constitution invested the courts of the United States with the same power. It was composed of many of the same men who, in the Convention, had framed the Constitution, and who had also been members of the Congress whose measures led to the Revolution. The jurisdiction thus given, for penalties and forfeitures upon tidewater, is in direct contradiction to the English system. But it was known to the members of the Convention that a jury trial could be prescribed by an act of Congress in the courts of admiralty. It was so in the colonial vice-admiralty of Virginia.

It may be mentioned, also, that chancery jurisdiction was given to the courts of the United States by the Constitution. There is here no trial by jury, and yet it controls and annuls the judgments of common law courts. Chancery courts existed in most of the colonies, — in New York, Virginia, &c., — and their existence was never complained of, because they were established by the colonies themselves.

2d. It encroaches upon the jurisdiction of the State tribunals.

This argument begs the question. It assumes that such jurisdiction would be an encroachment. We deny it. The words of the grant in the Constitution are, "to all cases of admiralty and maritime jurisdiction." They are words of the most comprehensive import; and from the language used, as well as from the reasonableness of the thing, we say that the people must be presumed to have intended a jurisdiction which was needful and proper to carry out, or to aid in carrying out, the great commercial purposes of the Constitution. In adopting the Constitution, the people intended to confer upon the federal government all the powers needful to accomplish the purposes for which it was formed. State courts are governed by the common law, and not the law maritime. The decisions of one State, moreover, are not binding on another, and thus there would be no uniformity. Whilst the regulation of the commerce of the country was in the hands of the federal government, if its courts had no jurisdiction over commercial questions which might arise out of that commerce, there would be one law in New York, another in Massachusetts, and a third in some other State.

(*Mr. Greene* continued much further his illustrations of this matter. But for them, or for his arguments upon the other points of the case, there is not room.)

*Mr. Webster*, upon the same side with *Mr. Greene*, laid down the following propositions, which he illustrated at considerable length.

This court has decided, —

First. That the admiralty jurisdiction of this government is not limited to the admiralty jurisdiction as it existed in England in 1789. The English rules, therefore, are not to be regarded. Waring *v.* Clarke, 5 Howard, 441.

Second. That a suit in admiralty lies for a tort committed on the high seas, or elsewhere within the ebb and flow of the tide. Waring *v.* Clarke, 5 Howard, 441.

Third. That in cases of tort, the proceeding may as well be *in personam* as *in rem.* Manro *v.* The Almeida, 10 Wheaton, 473.

Fourth. That in case of contract where there is a lien, the admiralty jurisdiction arises, though the contract may be made on land. Peyroux *v.* Howard, 7 Peters, 324; The General Smith, 4 Wheaton, 438.

Fifth. That the true question in cases of contract is this, to wit, whether the service agreed to be performed, and performed, be in its nature a maritime service. This excludes policies of insurance, but includes affreightment and all contracts to carry over and upon tide-waters. 7 Peters, 324; Lord Mansfield and other English judges; Hall's Admiralty, 1.

Sixth. In cases of contract, the proceeding may be *in personam*, as well as *in rem.* There would be a great inconsistency if this were not so. In cases where nothing more is sought than damages for the non-fulfilment of a contract, there are two objects, and two only, in proceeding by way of seizure of the *rem.* One to compel an appearance in the litigation, the other to obtain security. Both these are identical with the proceeding by way of attaching the defendant's goods, as in the case in 10 Wheaton. But it is important to remember, that, in cases of the seizure of the *rem*, the judgment or satisfaction is not limited to the proceeds of the sale thereof. If a balance remain unsatisfied, execution process goes against the defendant *in personam*, if he has appeared and contested the suit. In this case, therefore, the plaintiff proceeds *in personam* with as much regularity as belongs to any proceeding *in rem.* Besides, as the *res* went to the bottom, how could there be any proceeding *in rem.* If there were another case exactly like this, except that in such case a spar, or a sail, or the caboose-house, having been found floating, should have been seized, would this court have taken jurisdiction in one case and not in the other? 10 Wheaton, *ubi supra.*

Seventh. The court having decided that the constitutional grant of admiralty and maritime jurisdiction to the government of the United States is not to be limited by the rules which restrained the English admiralty in 1789, it follows of course, that the jurisdiction of the courts of the United States should naturally be coextensive with the granted power, unless Congress has otherwise declared; and as the Judiciary Act of 1789, section ninth, expressly vests in the District Courts of the United States original cognizance of all civil causes of admiralty and maritime jurisdiction, then whatever this court adjudges to be a case of admiralty and maritime jurisdiction belongs originally to the District Court, and invests that court necessarily with the power of all process and proceedings fit and proper for the exercise of its jurisdiction, subject to regulation by Congress.

Eighth. It is not, probably, doubted that the grant of admiralty and maritime jurisdiction to the government of the United States is exclusive, or that no state now retains any such power; and so absolutely indispensable has such a jurisdiction been found to be on the interior lakes and rivers, that Congress has been obliged to provide, and has provided, for its exercise on those waters. See Act of 1845.

The only objection to this necessary law seems to be, that Congress, in passing it, was shivering and trembling under the apprehension of what might be the ultimate consequence of the decision of this court in the case of the Thomas Jefferson. It pitched the power upon a wrong location.

Its proper home was in the admiralty and maritime grant, as in all reason, and in the common sense of all mankind out of England, admiralty and maritime jurisdiction ought to extend, and does extend, to all navigable waters, fresh or salt.

The Reporter understands that Mr. Chief Justice Taney, Mr. Justice McLean, and Mr. Justice Wayne, concurred in the following opinion.

Mr. Justice NELSON.

This is an appeal from the Circuit Court of the United States, held in and for the District of Rhode Island, in a suit originally commenced in the District Court in admiralty, and in which the Merchants' Bank of Boston were the libellants, and the New Jersey Steam Navigation Company the respondents.

The suit was instituted upon a contract of affreightment, for the purpose of recovering a large amount of specie lost in the Lexington, one of the steamers of the respondents running

between New York and Providence, which took fire and was consumed, on the night of the 13th of January, 1840, on Long Island Sound, about four miles off Huntington lighthouse, and between forty and fifty miles from the former city.

The District Court dismissed the libel *pro forma*, and entered a decree accordingly. An appeal was taken to the Circuit Court, where this decree of dismissal was reversed, and a decree entered for the libellants for the sum of $22,224, with costs of suit.

The case is now before this court for review.

William F. Harnden, a resident of Boston, was engaged in the business of carrying for hire small packages of goods, specie, and bundles of all kinds, daily, for any persons choosing to employ him, to and from the cities of Boston and New York, using the public conveyances between these cities as the mode of transportation. For this purpose, he had entered into an agreement with the respondents on the 5th of August, 1839, by which, in consideration of $250 per month, to be paid monthly, they agreed to allow him the privilege of transporting in their steamers between New York and Providence a wooden crate of the dimensions of five feet by five feet in width and height, and six feet in length, (contents unknown,) until the 31st of December following, subject to these conditions : —

1. The crate with its contents to be at all times exclusively at the risk of the said Harnden, and the respondents not in any event to be responsible, either to him or his employers, for the loss of any goods, wares, merchandise, money, &c., to be conveyed or transported by him in said crate, or otherwise in the boats of said company.

2. That he should annex to his advertisements published in the public prints the following notice, and which was, also, to be annexed to his receipts of goods or bills of lading : —

"Take notice. — William F. Harnden is alone responsible for the loss or injury of any articles or property committed to his care ; nor is any risk assumed by, nor can any be attached to, the proprietors of the steamboats in which his crate may be and is transported, in respect to it or its contents, at any time."

This arrangement expired on the 31st of December, 1839, but was on that day renewed for another year, and was in existence at the time of the loss in question.

A few days previous to the loss of the Lexington, the libellants employed Harnden in Boston to collect from the banks in the city of New York checks and drafts to the amount of about $46,000, which paper was received by him and forwarded to his agent in that city, with directions to collect and send home the same in the usual way. Eighteen thousand dollars of this sum

was put in the crate on board of that vessel on the 13th of January, for the purpose of being conveyed to the libellants, and was on board at the time she was lost, on the evening of that day.

Upon this statement of the case, three objections have been taken by the respondents to the right of the libellants to recover :—

1. That the suit is not maintainable in their names. That, if accountable at all for the loss, they are accountable to Harnden, with whom the contract for carrying the specie was made.

2. That if the suit can be maintained in the name of the libellants, they must succeed, if at all, through the contract with Harnden, which contract exempts them from all responsibility as carriers of the specie ; and,

3. That the District Court had no jurisdiction, the contract of affreightment not being the subject of admiralty cognizance.

We shall examine these several objections in their order.

I. As to the right of the libellants to maintain the suit.

They had employed Harnden to collect checks and drafts on the banks in the city of New York, and to bring home the proceeds in specie. He had no interest in the money, or in the contract with the respondents for its conveyance, except what was derived from the possession in the execution of his agency. The general property remained in the libellants, the real owners, subject at all times to their direction and control ; and any loss that might happen to it in the course of the shipment would fall upon them.

This would be clearly so if Harnden is to be regarded as a private agent ; and even if in the light of a common carrier of this description of goods, the result would not be changed, so far as relates to the right of property.

The carrier has a lien on the goods for his freight, if not paid in advance ; but subject to this claim he can set up no right of property or of possession against the general owners. (Story on Bailments, § 93, *g.*)

The carrier, says Buller, J., is considered in law the agent or servant of the owner, and the possession of the agent is the possession of the owner. (4 T. R. 490.)

Under these circumstances, the contract between Harnden and the respondents for the transportation of the specie was, in contemplation of law, a contract between them and the libellants ; and although made in his own name, and without disclosing his employers at the time, a suit may be maintained directly upon it in their names.

It would be otherwise, in a court of law, if the contract was under seal. (Story on Agency, § 160.)

It rested in parol, in this case, at the time of the loss.

In Sims *v.* Bond, 5 Barn. & Adol. 393, the court observed that it was a well-established rule of law, that, where a contract, not under seal, is made by an agent in his own name for an undisclosed principal, either the agent or the principal may sue on it ; the defendant in the latter case being entitled to be placed in the same situation, at the time of the disclosure of the real principal, as if the agent had been the contracting party.

The same doctrine is affirmed by Baron Parke, in delivering the judgment of the court in Higgins *v.* Senior, 8 Mees. & Wels. 834, 844, in the Court of Exchequer. In that case, it was held that the suit might be maintained on the contract, either in the name of the principal or of the agent, and that, too, although required to be in writing by the statute of frauds.

The rule is, also, equally well established in this country, as may be seen by a reference to the cases of Beebee *v.* Robert, 12 Wend. 413, Taintor *v.* Prendergast, 3 Hill, 72, and Sanderson *v.* Lamberton, 6 Binney, 129.

The last case is like the one before us. It was an action by the owners directly upon the sub-contract made by the first with the second carrier for the conveyance of the goods, in whose hands they were lost.

The cases are numerous in which the general owner has sustained an action of tort against the wrong-doer for injuries to the property while in the hands of the bailee. The above cases show that it may be equally well sustained for a breach of contract entered into between the bailee and a third person. The court look to the substantial parties in interest, with a view to avoid circuity of action ; saving, at the same time, to the defendant all the rights belonging to him if the suit had been in the name of the agent.

We think, therefore, that the action was properly brought in the name of the libellants.

II. The next question is as to the duties and liabilities of the respondents, as carriers, upon their contract with Harnden. As the libellants claim through it, they must affirm its provisions, so far as they may be consistent with law.

The general liability of the carrier, independently of any special agreement, is familiar. He is chargeable as an insurer of the goods, and accountable for any damage or loss that may happen to them in the course of the conveyance, unless arising from inevitable accident, — in other words, the act of God or the public enemy. The liability of the respondents, therefore, would be undoubted, were it not for the special agreement under which the goods were shipped.

The question is, to what extent has this agreement qualified the common law liability ?

We lay out of the case the notices published by the respond-ents, seeking to limit their responsibility, because, —

1. The carrier cannot in this way exonerate himself from duties which the law has annexed to his employment; and,

2. The special agreement with Harnden is quite as compre-hensive in restricting their obligation as any of the published notices.

A question has been made, whether it is competent for the carrier to restrict his obligation even by a special agreement. It was very fully considered in the case of Gould and others v. Hill and others, 2 Hill, 623, and the conclusion arrived at that he could not.    See also Hollister v. Nowlen, 19 Wend. 240, and Cole v. Goodwin, ib. 272, 282.

As the extraordinary duties annexed to his employment con-cern only, in the particular instance, the parties to the trans-action, involving simply rights of property, — the safe cus-tody and delivery of the goods, — we are unable to perceive any well-founded objection to the restriction, or any stronger reasons forbidding it than exist in the case of any other in-surer of goods, to which his obligation is analogous; and which depends altogether upon the contract between the parties.

The owner, by entering into the contract, virtually agrees, that, in respect to the particular transaction, the carrier is not to be regarded as in the exercise of his public employment; but as a private person, who incurs no responsibility beyond that of an ordinary bailee for hire, and answerable only for misconduct or negligence.

The right thus to restrict the obligation is admitted in a large class of cases founded on bills of lading and charter-parties, where the exception to the common law liability (other than that of inevitable accident) has been, from time to time; enlarged, and the risk diminished, by the express stipula-tion of the parties.    The right of the carrier thus to limit his liability in the shipment of goods has, we think, never been doubted.

But admitting the right thus to restrict his obligation, it by no means follows that he can do so by any act of his own. He is in the exercise of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned. And this is not to be implied or inferred from a general notice to the public, limiting his obligation, which may or may not be assented to.    He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities inci-dent to his employment, and is liable to an action in case of

New Jersey Steam Navigation Company v. Merchants' Bank.

refusal. And we agree with the court in the case of Hollister v. Nowlen, that, if any implication is to be indulged from the delivery of the goods under the general notice, it is as strong that the owner intended to insist upon his rights, and the duties of the carrier, as it is that he assented to their qualification.

The burden of proof lies on the carrier, and nothing short of an express stipulation by parol or in writing should be permitted to discharge him from duties which the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful and conflicting evidence; but should be specific and certain, leaving no room for controversy between the parties.

The special agreement, in this case, under which the goods were shipped, provided that they should be conveyed at the risk of Harnden; and that the respondents were not to be accountable to him or to his employers, in any event, for loss or damage.

The language is general and broad, and might very well comprehend every description of risk incident to the shipment. But we think it would be going farther than the intent of the parties, upon any fair and reasonable construction of the agreement, were we to regard it as stipulating for wilful misconduct, gross negligence, or want of ordinary care, either in the seaworthiness of the vessel, her proper equipments and furniture, or in her management by the master and hands.

This is the utmost effect that was given to a general notice, both in England and in this country, when allowed to restrict the carrier's liability, although as broad and absolute in its terms as the special agreement before us (Story on Bailm. § 570); nor was it allowed to exempt him from accountability for losses occasioned by a defect in the vehicle, or mode of conveyance used in the transportation. (13 Wend. 611, 627, 628.)

Although he was allowed to exempt himself from losses arising out of events and accidents against which he was a sort of insurer, yet, inasmuch as he had undertaken to carry the goods from one place to another, he was deemed to have incurred the same degree of responsibility as that which attaches to a private person, engaged casually in the like occupation, and was, therefore, bound to use ordinary care in the custody of the goods, and in their delivery, and to provide proper vehicles and means of conveyance for their transportation.

This rule, we think, should govern the construction of the agreement in question.

If it is competent at all for the carrier to stipulate for the

gross negligence of himself, and his servants or agents, in the transportation of the goods, it should be required to be done, at least, in terms that would leave no doubt as to the meaning of the parties.

The respondents having succeeded in restricting their liability as carriers by the special agreement, the burden of proving that the loss was occasioned by the want of due care, or by gross negligence, lies on the libellants, which would be otherwise in the absence of any such restriction. We have accordingly looked into the proofs in the case with a view to the question.

There were on board the vessel one hundred and fifty bales of cotton, part of which was stowed away on and along side of the boiler-deck, and around the steam-chimney, extending to within a foot or a foot and a half of the casing of the same, which was made of pine, and was itself but a few inches from the chimney. The cotton around the chimney extended from the boiler to within a foot of the upper deck.

The fire broke out in the cotton next the steam-chimney, between the two decks, at about half past seven o'clock in the evening, and was discovered before it had made much progress. If the vessel had been stopped, a few buckets of water, in all probability, would have extinguished it. No effort seems to have been made to stop her, but, instead thereof, the wheel was put hard a-port, for the purpose of heading her to the land. In this act, one of the wheel-ropes parted, being either burnt or broken, in consequence of which the hands had no longer any control of the boat.

Some of them then resorted to the fire-engine, but it was found to be stowed away in one place in the vessel, and the hose belonging to it, and without which it was useless, in another, and which was inaccessible in consequence of the fire.

They then sought the fire-buckets. Two or three only, in all, could be found, and but one of them properly prepared and fitted with heaving-lines; and, in the emergency, the specie-boxes were emptied, and used to carry water.

The act of Congress (5 Statutes at Large, 306, § 9) made it the duty, at the time, of these respondents to provide, as a part of the necessary furniture of the vessel, a suction-hose and fire-engine, and hose suitable to be worked in case of fire, and to carry the same on every trip, in good order; and further provided, that iron rods or chains should be employed and used in the navigation of steamboats, instead of wheel or tiller ropes.

This latter provision was wholly disregarded on board the vessel during the trip in question; and the former also, as we have seen, for all practical or useful purposes.

We think there was great want of care, and which amounted to gross negligence, on the part of the respondents, in the stowage of the cotton; especially, regarding its exposure to fire from the condition of the covering of the boiler-deck, and the casing of the steam-chimney. The former had been on fire on the previous trip, and a box of goods partly consumed. Also, for the want of proper furniture and equipments of the vessel, as required by the act of Congress, as well as by the most prudential considerations.

It is, indeed, difficult, on studying the facts, to resist the conclusion, that, if there had been no fault on board in the particulars mentioned, and the emergency had been met by the officers and crew with ordinary firmness and deliberation, the terrible calamity that befell the vessel and nearly all on board would have been arrested.

We are of opinion, therefore, that the respondents are liable for the loss of the specie, notwithstanding the special agreement under which it was shipped.

III. The remaining question is as to the jurisdiction of the court.

By the second section of the third article of the Constitution, it is declared that "the judicial power shall extend" "to all cases of admiralty and maritime jurisdiction."

The ground of objection to the jurisdiction, in this case, rests upon the assumption, that this provision had reference to the jurisdiction of the High Court of Admiralty in England, as restrained by the statutes of 13 and 15 Richard II., or as exercised in the colonies by the courts of vice-admiralty, which, as their decisions were subject to the appellate power of the High Court at home, with few exceptions, and those by act of Parliament, were confined within the same limits.

This is the foundation of the argument in support of the restricted jurisdiction, and which, it is claimed, excludes the contract in question.

Under the statutes of Richard, as expounded by the common law courts, in cases of prohibition against the admiralty, its jurisdiction over contracts was confined to seamen's wages, bottomry bonds, and contracts made and to be executed on the high seas.

If made on land, or within the body of an English county, though to be executed, or the service to be performed, upon the sea, or if made upon the sea, but to be executed upon the land, in either case it was held by the common law courts that the admiralty had no jurisdiction. In the first, because the place where the contract was made, and in the second, where it was to be performed, was within the body of the

county, and, of course, within the cognizance of the common law courts, which excluded the admiralty.

It is not to be denied, therefore, if the grant of power in the Constitution had reference to the jurisdiction of the admiralty in England at the time, and is to be governed by it, that the present suit cannot be maintained, as the District Court of Rhode Island had no jurisdiction.

But in answer to this view, and to the ground on which it rests, we have been referred to the practical construction that has been given to the Constitution by Congress in the Judiciary Act of 1789, which established the courts of admiralty, and assigned to them their jurisdiction; and also to the adjudications of this, and of the Circuit and District Courts, in admiralty cases, which not only reject the very limited jurisdiction in England, but assert and uphold a jurisdiction much more comprehensive, both in respect to contracts and torts, and which has been exercised ever since the establishment of these courts. And it is insisted, that, whatever may have been the doubt, originally, as to the true construction of the grant, whether it had reference to the jurisdiction in England, or to the more enlarged one that existed in other maritime countries, the question has become settled by legislative and judicial interpretation, which ought not now to be disturbed.

We are inclined to concur in this view, and shall proceed to state some of the grounds in support of it.

By the ninth section of the Judiciary Act of 1789, which established the admiralty courts, it is declared that the District Courts " shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, *including all seizures under the laws of impost, navigation, or trade of the United States, where the seizures are made on waters which are navigable from the sea by vessels of ten or more tons burden, within their respective districts, as well as upon the high seas ; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it.*"

The High Court of Admiralty in England never had original jurisdiction of causes arising under the revenue laws, or laws concerning the navigation and trade of the kingdom. They belong, exclusively, to the jurisdiction of the Court of Exchequer, in which the proceedings are conducted as at common law.

That court exercises an appellate power over the decisions of the vice-admiralty courts in revenue cases in the colonies; even that power was doubted, till affirmed by the Court of Delegates, on an appeal from a decision of the vice-admiralty

court in South Carolina, in 1754. Since then, it has been exercised; but this is the extent of its power over revenue cases, or cases arising under the navigation laws.

Thus it will be seen that a very wide departure from the English limit of admiralty jurisdiction took place within two years after the adoption of the Constitution; and that, too, by the Congress called upon to expound the grant with a view to the establishment of the proper tribunals to carry it into execution.

The constitutionality of this act of Congress, and, of course, the true construction of the grant in the Constitution, became a subject of discussion before this court, at a very early day, on several occasions, and received its particular consideration.

The first case that involved the question was the case of The Vengeance, in 1796, nine years after the adoption of the Constitution. (3 Dallas, 297.)

The vessel was seized by the marshal in the port of New York, as forfeited under an act of Congress, prohibiting the exportation of arms, and libelled and condemned in the District Court. On appeal, the Circuit Court reversed the decree and dismissed the proceedings; upon which an appeal was taken to this court.

On the argument, the Attorney-General took two grounds for reversing the decree. The second was, that, even if the proceeding could be considered a civil suit, it was not a suit of admiralty and maritime jurisdiction; and therefore the Circuit Court should have remanded it to the District Court, to be tried before a jury. He referred to the ninth section of the Judiciary Act, which declared, that "the trials of issues of fact in the District Courts, in all causes except *civil causes* of admiralty and maritime jurisdiction, shall be by jury," and insisted, that a libel for a violation of the navigation laws was not a civil suit of admiralty jurisdiction; that the principles regulating the admiralty jurisdiction in this country must be such as were consistent with the common law of England at the period of the Revolution; that there admiralty causes must be causes arising wholly upon the sea, and not within the precincts of any county; that the act of exporting arms must have commenced on land, and if done part on land and part on the sea, the authorities held that the admiralty had no jurisdiction.

The court took time to consider the question, and on a subsequent day gave judgment, holding that the suit was a civil cause of admiralty and maritime jurisdiction, and therefore rightfully tried by the District Court without a jury; that the case was one coming within the general admiralty powers of the court; and, for a like reason, it was held that the appeal to the Circuit Court was regular, and properly disposed of.

It will be observed that the seizure, in this case, was in the port of New York, and within the body of the county, which extends to Sandy Hook.

The next case that came before the court was the case of The Schooner Sally, in 1805, which arose in the Maryland district, and involved the same question as in the case of the Vengeance, and was decided in the same way.

But the most important one, as it respects the question before us, was the case of The Schooner Betsey, in 1808 (4 Cranch, 443). This vessel was seized for a violation of the non-intercourse act between the United States and St. Domingo, in the port of Alexandria, in this District. She was condemned in the District Court; but on appeal the Circuit Court reversed the decree, from which an appeal was taken to this court.

Mr. Lee, who had argued the case of the Vengeance, appeared for the claimant, and requested permission to argue the point again more at large, namely, whether the case was one of admiralty and maritime jurisdiction; and in this argument will be found the ground and substance of all the arguments which have been since urged in favor of the limited construction of the admiralty power under the Constitution.

He referred to the terms of the grant in the Constitution, and denied that Congress could make cases of admiralty jurisdiction; nor could it confer on the federal courts jurisdiction of a case which was not of admiralty and maritime cognizance at the time of the adoption of the Constitution. That the seizure of a vessel within the body of a county, for a breach of a municipal law of trade, was not of admiralty cognizance, — that it was never so considered in England, — that all seizures in that country for a violation of the revenue and navigation acts were tried by a jury, in the Court of Exchequer, according to the course of the common law, — that the High Court of Admiralty in England exercised no jurisdiction in revenue cases, — and insisted, that if the ninth section of the Judiciary Act was to be construed as including revenue cases and seizures under the navigation acts as civil causes of admiralty and maritime jurisdiction, the act was repugnant to the Constitution, and void.

The court rejected the argument, and held that the case was not distinguishable from that of the Vengeance, and which they had already determined belonged properly to the jurisdiction of the admiralty. They observed, that it was the place of seizure, and not the place of committing the offence, that determined the jurisdiction, and regarded it as clear that Congress meant to discriminate between seizures on waters navigable

from the sea, and seizures on land or on waters not navigable, and to class the former among the civil causes of admiralty and maritime jurisdiction.

Similar objections were taken to the jurisdiction of the court in the cases of The Samuel and The Octavia (1 Wheat. 9 and 20), and received a similar answer from the court.

We have been more particular in referring to these cases, and to the arguments of counsel, because they show, —

1. That the arguments used in the present case against the jurisdiction, and in favor of restricting it to the common law limit in England at the Revolution, have been heretofore presented to the court, on several occasions, and at a very early day, and on each, after full consideration, were rejected, and the judgment of the court placed upon grounds altogether inconsistent with that mode of construing the Constitution ; and,

2. They affirm the practical construction given to the Constitution by Congress in the act of 1789, which, we have seen, assigns to the District Courts, in terms, a vast field of admiralty jurisdiction unknown to that court in England.

The jurisdiction in all these cases is maintained on the broad ground, that the subject-matter was of admiralty cognizance, as the causes of action arose out of transactions that had occurred upon the high seas, or within the ebb and flow of the tide ; expressly rejecting the common law test, which was attempted to be applied, namely, that they arose within the body of a county, and therefore out of the limits of the admiralty.

In answer to an argument that was pressed, that the offence must have been committed upon land, such as in case of an exportation of prohibited goods, the court say that it is the place of seizure, and not the place of committing the offence, that decides the jurisdiction, — a seizure upon the high seas or within tide-waters, although the tide-waters may be within the body of a county.

All the cases thus arising under the revenue and navigation laws were held to be civil causes of admiralty and maritime jurisdiction within the words of the Constitution, and, as such, were properly assigned to the District Court, in the act of 1789, as part of its admiralty jurisdiction.

They were so regarded, as well in respect to the subject-matter as in respect to the place where the causes of action had arisen.

The clause in the act of 1789, " saving to suitors in all cases the right of a common law remedy where the common law is competent to give it," was referred to on the argument in support of the restricted jurisdiction. And it was insisted that the remedy is thus saved to both parties, plaintiff and defendant,

33 *

and is, in effect, an exception from the admiralty power conferred upon the District Courts of all causes in which a remedy might be had at common law.

The language is certainly peculiar, and unfortunate, if this was the object of the clause ; and besides, the construction would exclude from the District Court cases which the sternest opponent of the admiralty will admit properly belonged to it.

The common law courts exercise a concurrent jurisdiction in nearly all the cases of admiralty cognizance, whether of tort or contract (with the exception of proceedings *in rem*), which, upon the construction contended for, would be transferred from the admiralty to the exclusive cognizance of these courts.

The meaning of the clause we think apparent.

By the Constitution, the entire admiralty power of the country is lodged in the federal judiciary, and Congress intended by the ninth section to invest the District Courts with this power, as courts of original jurisdiction.

The term " exclusive original cognizance " is used for this purpose, and is intended to be exclusive of the State, as well as of the other federal courts.

The saving clause was inserted, probably, from abundant caution, lest the exclusive terms in which the power is conferred on the District Courts might be deemed to have taken away the concurrent remedy which had before existed.

This leaves the concurrent power where it stood at common law.

The clause has no application to seizures arising under the revenue laws, or laws of navigation, as these belong exclusively to the District Courts. (Slocum *v.* Mayberry, 2 Wheat. 1; Gelston *v.* Hoyt, 3 ib. 246.)

If the thing seized is acquitted, then the owner may prosecute the wrong-doer for the taking and detention, either in admiralty or at common law. The remedy is concurrent. (Ibid.)

2. Another class of cases in which jurisdiction has always been exercised by the admiralty courts in this country, but which is denied in England, are suits by ship-carpenters and material men, for repairs and necessaries, made and furnished to ships, whether foreign or in the port of a State to which they do not belong, or in the home port, if the municipal laws of the State give a lien for the work and materials. (1 Peters's Adm. R. 227, 233, note ; Bee's Adm. R. 106 ; 4 Wash. C. C. R. 453 ; 1 Payne, 620 ; Gilpin, D. C. R. 203, 473 ; 1 Wheat. 96 ; 4 ib. 438 ; 9 ib. 409 ; 10 ib. 428 ; 7 Peters, 324 ; 11 ib. 175.)

The principle stated in the case of The General Smith, 4 Wheat. 438, and which has been repeated in all the subse-

New Jersey Steam Navigation Company *v.* Merchants' Bank.

quent cases, is, that where repairs have been made or necessaries furnished to a foreign ship, or to a ship in the ports of a State to which she does not belong, the general maritime law gives a lien on the ship as security, and the party may maintain a suit in admiralty to enforce his right. But as to repairs or necessaries in the port or State to which the ship belongs, the case is governed altogether by the local law of the State, and no lien is implied unless recognized by that law. But if the local law gives the lien, it may be enforced in admiralty.

The jurisdiction in these cases, as will be seen from the authorities referred to, appears to have been exercised by the District Courts from the time of their earliest organization, and which was affirmed by this court the first time the question came before it.

The District Court of South Carolina, in 1796, in the case of North and Vesey *v.* The Brig Eagle, Bee's R. 79, maintained a libel for supplies furnished a foreign vessel, and considered the question as a very clear one at that day. See also Pritchard *v.* The Lady Horatia, p. 169, decided in 1800.

Judge Winchester, district judge of the Maryland district, maintained the jurisdiction, in a most able opinion, at a very early day. (1 Peters's Adm. R. 233, note.)

The same opinion was also entertained by Judge Peters, of the Pennsylvania district. (1 Peters, 227.)

Since then, the jurisdiction appears to have been undisputed.

We refer to these opinions, not so much for the authority they afford, though entitled to the highest respect as such, but as evidence of the line of jurisdiction exercised, at that early day, by learned admiralty lawyers, in direct contradiction to the theory, that the constitutional limit is to be determined by the jurisdiction in England. They are the opinions of men of the Revolution, engaged in administering admiralty law as understood in the country soon after the adoption of the Constitution, fresh from the discussions which every provision and grant of power in that instrument had undergone. The opinions may be well referred to as affording the highest evidence of the law on this subject in their day.

3. Another class of cases in which jurisdiction is entertained by the courts in this country on contracts, but which is denied in England, are suits for pilotage. (10 Peters, 108). It is denied in England on the ground of locality, the contract having been made within the body of a county.

We shall pursue the examination no farther. The authorities, we think, are decisive against expounding the constitutional grant according to the jurisdiction of the English admiralty, and in favor of a line of jurisdiction which fully embraces the contract in question.

Before jurisdiction can be withheld in the case, the court must not only retrace its steps, and take back several of its decided cases, but must also disapprove of the ground which has heretofore been taken, and maintained in every case, as the proper test of admiralty jurisdiction.

Some question was made on the argument founded on the circumstance, that this was a suit *in personam*.

The answer is, if the cause is a maritime cause, subject to admiralty cognizance, jurisdiction is complete over the person, as well as over the ship; it must, in its nature, be complete, for it cannot be confined to one of the remedies on the contract, when the contract itself is within its cognizance.

On looking into the several cases in admiralty which have come before this court, and in which its jurisdiction was involved or came under its observation, it will be found that the inquiry has been, not into the jurisdiction of the court of admiralty in England, but into the nature and subject-matter of the contract, — whether it was a maritime contract, and the service a maritime service, to be performed upon the sea, or upon waters within the ebb and flow of the tide. And, again, whether the service was to be substantially performed upon the sea, or tide-waters, although it had commenced and had terminated beyond the reach of the tide ; if it was, then jurisdiction has always been maintained.   But if the substantial part of the service under the contract is to be performed beyond tide-waters, or if the contract relates exclusively to the interior navigation and trade of a State, jurisdiction is disclaimed.   (10 Wheat. 428 ; 7 Peters, 324 ; 11 ib. 175 ; 12 ib. 72 ; 5 Howard, 463.)

The exclusive jurisdiction in admiralty cases was conferred on the national government, as closely connected with the grant of the commercial power.

It is a maritime court instituted for the purpose of administering the law of the seas.   There seems to be ground, therefore, for restraining its jurisdiction, in some measure, within the limit of the grant of the commercial power, which would confine it, in cases of contracts, to those concerning the navigation and trade of the country upon the high seas and tide-waters with foreign countries, and among the several States.

Contracts growing out of the purely internal commerce of the State, as well as commerce beyond tide-waters, are generally domestic in their origin and operation, and could scarcely have been intended to be drawn within the cognizance of the federal courts.

Upon the whole, without pursuing the examination farther, we are satisfied that the decision of the Circuit Court below was correct, and that its decree should be affirmed.

Mr. Justice CATRON.

1. In my judgment, the New Jersey Steam Navigation Company were entitled to all the benefits of Harnden's contract with them, in regard to the property of others with which he (Harnden) was intrusted, for the purpose of transporting it in his crate. And though the company can rely on all the defences which they could have relied upon if Harnden had sued them, still I think the libellants can maintain this suit.

Had a trover and conversion been made of the money sued for, or an open trespass been committed on it by throwing it overboard, by the servants or agents of the company, then either Harnden, the bailee of the bank, might have sued the company, or the bank might have sued. As to the right to sue, in the case put, by the bank, there can be no doubt; as such acts were never contemplated by the contract, nor covered by it.

The Navigation Company were responsible to Harnden (and to those who employed him), notwithstanding the contract, for acts of gross negligence in transporting the property destroyed; as, for instance, if the servants of the company, in navigating the vessel, omitted to observe even slight diligence, and failed in the lowest degree of prudence, to guard against fire, then they must be deemed in a court of justice to have been guilty of gross negligence; by which expression I mean, that they acted reckless of consequences as respected the safety of the vessel and the lives and property on board and in their charge, that such conduct was contrary to common honesty, and that the master and owners were liable for loss by reason of such recklessness, as they would have been in case of an affirmative and meditated fraud that had occasioned the same loss, and that this burning was a tort.

Whether it is evidence of fraud in fact, as Sir William Jones intimates, or whether it is not, as other writers on bailments declare, is not worthy of discussion. The question is this. Is the measure of liability the same where a ship is burned because the master and crew did not observe the lowest degree of prudence to prevent it, and in a case where she is *wilfully* burned? This is the question for our consideration. In the civil law, I apprehend no distinction in the cases put exists; nor do I believe any exists at common law. But by the laws of the United States, such gross and reckless negligence as that proved in the case before us was a fraud and a tort on the shippers, and the fire that occurred, and consequent loss of life, a crime on the part of the master.

By the twelfth section of the act of 1838, chap. 191, every person employed on any steamboat or vessel, by whose negli-

gence to his respective duty the life of any person shall be destroyed, shall be deemed guilty of manslaughter, and subject to conviction and imprisonment at hard labor for a time not exceeding ten years. 5 Statutes at Large, 306. Here the legislature have put gross negligence in the category of crimes of a high grade, and of frauds of course; nor can this court assume a less stringent principle, in a case of loss of property, than Congress has recognized as the true one, if life be destroyed by such negligence. From the facts before us, I feel warranted in saying, that, had the captain survived the destruction of the ship and the loss of many lives by the disaster, he would have been clearly guilty according to the twelfth section.

One single circumstance is decisive of the culpable negligence. By section ninth of the above act, it is made " the duty of the master and owner of every steam-vessel employed on the sea, to provide, as a part of the necessary furniture, a suction-hose and fire-engine and hose suitable to be worked on said boat in case of fire, and carry the same upon each and every voyage, in good order." This vessel had something of the kind; but it was in no order for use, and a mere delusion, and a sheer fraud on the law and the public. Had there been such an engine and hose, the fire could have been extinguished in all probability, as I apprehend.

2. There was only a single rigged bucket on board, and nothing else to reach the water with, and the money of libellants was thrown from the boxes, and they used to lift water.

3. The flue from the furnace ran through three decks, and was red-hot through the three decks, and the cotton was stowed within eighteen inches on all sides of this red-hot flue, and the bales pressed in, three tiers deep, from the boiler-deck to the next deck, so that it would have been with much difficulty that the cotton could have been removed should a fire occur; there the fire did occur, and the cotton was not removed, — wherefore the vessel was burnt. And from the mode of stowage a fire could hardly be avoided, and was to be expected and guarded against.

Then as to the jurisdiction. The fire occurred on the high sea. It was a tort there. The case depends not on any contract, but on mere tort standing beyond the contract. The locality of the tort is the *locus* of jurisdiction. Locality is the strict limit. 2 Bro. Adm. Law, 110; 3 Bl. Comm. 106. The conflict between the Luda and De Soto, in Louisiana, 1847, 5 Howard. But especially 2 Bro. Adm. Law, 144, which lays down the true doctrine as follows: —

" We have now done with the effect of the master's con-

tracts or violence, as to his owners, and proceed to consider how he and they are affected by his negligence. And, first, as soon as merchandises and other commodities be put on board a ship, whether she be riding in a port or haven, or upon the high sea, the master is chargeable therewith; and if the same be lost or purloined, or sustain any damage, hurt, or loss, whether in the haven or port before, or upon the seas after, she is upon her voyage, whether it be by mariners or by any other through their permission, the owner of the goods has his election to charge either master or owners, or both, at his pleasure, — though he can have but one satisfaction, — in a court of common law, if the fault be committed *infra corpus comitatus ;* in the admiralty, if *super altum mare ;* and if it be on a place where there is *divisum imperium,* then in one or the other, according to the flux or reflux of the sea."

I think the libel in this case covers my view of it. It sets out the facts of how the money was shipped in general terms, but avers it was lost by fire, and by reason of an insufficient furnace, insufficient machinery, furniture, rigging, and equipments, and the careless, negligent, and improper management of said steamboat Lexington by the servants and agents of the Navigation Company.

If this technical objection had been addressed to the court below, it could have been easily remedied, and cannot be favorably heard here, now, no doubt, made for the first time.

I therefore think there was jurisdiction in the Circuit Court to try the libel; and, secondly, that the decree was proper, and ought to be affirmed, without alteration.

Mr. Justice DANIEL.

The inquiries presented for consideration in this cause resolve themselves into two obvious or natural divisions; the one involving the rights of the parties as growing out of their alleged undertakings; the other the right of the libellant to prosecute his claim in the mode adopted in the court below, and the power of the court to adjudicate it in that or in any other mode whatever. This latter inquiry, embracing as it does the nature and extent of the admiralty powers of the government of the United States, and by consequence the construction of that article of the Constitution by which alone those powers have been invested, challenges the most solemn, deliberate, and careful investigation. I approach that investigation with the diffidence which its wide-spread interest and importance, and a deep conviction of my own deficiences, cannot but awaken.

The foundation, nay, the whole extent and fabric, of the ad-

miralty power of the government are to be found in that portion of the second section of the third article of the Constitution, which declares that the judicial power shall extend (amongst other subjects of cognizance there enumerated) "to all cases of admiralty and maritime jurisdiction."

The distribution of this admiralty power so created by the Constitution, with reference to the tribunals by which, and the modes in which, it shall be executed, is contained in the act to establish the judicial courts of the United States of 1789, section ninth, which constitutes the District Courts of the United States courts of exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, and of certain seizures under the laws of imposts, concluding or qualifying this investment of power with these plain and significant terms : — "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it."

Looking now to the provisions of the third article of the Constitution, and to those of the ninth section of the Judiciary Act, we recur to the inquiry, What is this civil and maritime jurisdiction derived from the Constitution, and vested by the Judiciary Act in the District Courts, — what the standard by which its scope and power, its "space and verge," are to be measured, — what the rules to be observed in the modes of its execution? Although the Constitution and act of Congress do not precisely define nor enumerate the former, nor prescribe in forms and precedents the latter, yet it will hardly be pretended, that either the substance or the forms of admiralty jurisdiction were designed by the founders of our jurisprudence to be left without limit, to be dependent on surmise merely, or controlled by fashion or caprice. They were both ordained in reference to some known standard in the knowledge and contemplation of the statesman and legislator, and the ascertainment of that standard by history, by legislative and judicial records, must furnish the just response to the inquiry here propounded.

In tracing the origin, existence, and progress of the colonial institutions, or in seeking illustrations or analogies requisite for the comprehension of those institutions down to the period of separation from the mother country, it is to the laws and policy of the latter that we must chiefly look as guides to any thing like accurate results in our investigations. For the necessity here intimated, various and obvious causes will at once be perceived. As instances of these may be exemplified, — 1st, similarity of education and opinion, strengthened by intercourse and habit; 2d, national pride, and the partiality which naturally creates in the offspring admiration and imitation of the parent; 3d, identity of civil and political rights in the

people of both regions; 4thly, and chiefly, perhaps, the jealousy of the mother country with regard to her national unity, power, and greatness, — a principle which has ever prompted her to bind in the closest practicable system of efficient uniformity and conformity the various members of her extended empire. These causes have had their full effect in regulating the rights of person and of property amongst British subjects everywhere within the dominions of England. There is not, and never has been, a question connected with either, in which we do not find every Englishman appealing to the common law, or to the charters and statutes of England, as defining the nature and as furnishing the best protection of his rights. He uniformly clings to these as constituting at once his birthright, his pride, and his security. *Vide* 1 Bl. Comm. 127, 128. Would it not be most strange, then, with this strong tenacity of adherence to their peculiar national polity and institutions, that we should suppose the government or the people of England disposed to yield their cherished laws and customs in matters which peculiarly affect them in a national point of view, to wit, the administration of their maritime and commercial rights and interests? It would seem to me equally reasonable to expect that the admiralty courts of England, or of any part of the dominions of England, in order to define or settle their jurisdiction, would as soon be permitted to adopt, as the source and foundation and measure of their power, the ordinances, if such there be, of China or Thibet, as those of France, Genoa, or Venice, or of any other portion of the continent of Europe, whether established by the several local governments on the continent, or based upon the authority of the civil law. With respect to the realm of England, the origin and powers of the court of admiralty are placed upon a footing which leaves them no longer subjects of speculation or uncertainty. Sir William Blackstone, in his Commentaries, Vol. III. chap. 5, p. 69, informs us, — upon the authority of Sir Henry Spelman, Glossary, 13, and of Lambard, Archeion, 41, — that the Court of Admiralty was first erected by King Edward III. Sir Matthew Hale, in his History of the Common Law, Vol. I. p. 51 (London edition of 1794, by Runnington), speaking of the court of admiralty, says, — " This court is not bottomed or founded upon the authority of the civil law, but hath both its powers and jurisdiction by the law and custom of the realm in such matters as are proper for its cognizance." And in a note (*m*) by the editor to the page just cited, it is said, — " The original jurisdiction of the admiralty is either by the connivance or permission of the common law courts. The statutes are only *in affirmance* of the common law, and to pre-

vent the great power which the admiralty had gotten in consequence of the Laws of Oleron. That, generally speaking, the courts of admiralty have no jurisdiction in matters of contracts done or made on land; and the true reason for their jurisdiction in matters done at sea is, because no jury can come from thence; for if the matter arise in any place from which the *pais* can come, the common law will not suffer the subject to be drawn *ad aliud examen*." And for this doctrine are cited 12 Reports, 129; Roll. Abr. 531; Owen, 122; Brownlow, 37 *a*; Roll. Rep. 413; 1 Wilson, 101; Hobart, 12; and Fortescue, De Laudibus, 103, edit. 1775. Again, Lord Hale, Vol. I. pp. 49 —51, speaking of the jurisdiction of the admiralty, lays down the following limits to its power: — " The jurisdiction of the admiralty court, as to the matter of it is confined by the laws of the realm to things done upon the high sea only; as depredations and piracies upon the high sea; offences of masters and mariners upon the high sea; maritime contracts made and to be executed upon the high sea; matters of prize and reprisal upon the high sea. But touching contracts or things made within the bodies of the English counties, or upon the land beyond the sea, though the execution thereof be in some measure upon the high sea, as charter-parties or contracts made even upon the high sea, — touching things that are not in their own nature maritime, as a bond or contract for the payment of money, — so also of damages in navigable rivers, within the bodies of counties, things done upon the shore at low-water, wreck of the sea, &c., — these things belong not to the admiral's jurisdiction. And thus the common law and the statutes of 13 Richard II., cap. 15, and of 15 Richard II., cap. 3, confine and limit their jurisdiction to matters maritime, and such only as are done upon the high sea."

In this cursory view of Lord Hale of the admiralty jurisdiction, there is one feature which cannot escape the most superficial observation; and that is, the extraordinary care of this learned judge to avoid every implication from uncertainty or obscurity of terms, which might be wrested as a pretext for the assumption of power not clear, well founded, and legitimate. In the extract above given, it will be seen that the sea, as the theatre of the admiralty power, is mentioned in eight different instances, in every one of which it is accompanied with the adjunct *high*. *Altum mare* is given as the only legitimate province of the admiral's authority; and then, as if to exclude the possibility of improper implication, are placed in immediate and striking contrast the transactions and the situations as to which, by the common law and the statutes of England, the interference of the admiralty was utterly inhibited. " But,"

he proceeds to say, " touching contracts or things made within the bodies of the English counties, or upon the land beyond the sea, though the execution thereof be in some measure upon the high sea, as charter-parties or contracts made even upon the high sea, — touching things that are not in their own nature maritime, as a bond or contract for the payment of money, — so also of damages in navigable rivers, within the bodies of English counties, things done upon the shore at low-water, wreck of the sea, &c., — these things belong not to the admiral's jurisdiction."

Sir William Blackstone, treating of the cognizance of private wrongs, Book 3, chap. 7, p. 106, speaks of injuries cognizable by the maritime or admiralty courts. " These courts," says this writer, " have jurisdiction and power to try and determine all maritime causes, or such injuries as, although they are in their nature of common law cognizance, yet, being committed on the high seas, out of the reach of our ordinary courts of justice, are therefore to be remedied in a peculiar court of their own. All admiralty causes must, therefore, be causes arising wholly upon the sea." He then cites the statutes 13 and 15 Rich. II., Co. Litt. 260, Hob. 79, and 5 Reports, 106, for the positions thus asserted. I shall, in the progress of this opinion, have occasion further to remark upon this language, " courts maritime or admiralty courts," here used by this learned commentator, when I come to speak of an interpretation placed upon the second section of the third article of the Constitution, as implying an enlargement of the powers conferred, from a connection of the terms *admiralty* and *maritime* in the section just mentioned. What I would principally advert to here is the description of the causes denominated *maritime*, and as falling solely and peculiarly within the admiralty jurisdiction, and to the reason why they are thus denominated *maritime*, and as such assigned to the admiralty. They are, says this learned commentator, " maritime, or such injuries as, although they are in their nature of common law cognizance, yet, being committed on the high seas, out of the reach of our ordinary courts of justice, are therefore to be remedied in a peculiar court of their own. All admiralty causes must, therefore, be causes arising wholly upon the sea, and not within the precincts of any county." Here, then, is the explicit declaration, that it is the theatre, the place of their origin and performance, exclusively, not their relation to maritime subjects, which determines their forum ; for they are causes, says he, which in their nature may be of common law cognizance. In this connection it seems not out of place to advert to the discrimination made by the same author between the pretensions to power

advanced by certain tribunals which subsisted and grew up rather by toleration than as forming any fundamental and regular portions of the British constitution. Thus, in Book 3, chap. 7, pp. 86, 87, speaking of the ecclesiastical, military, and maritime courts, and the courts of common law, he says, — "And with regard to the three first, I must beg leave, not so much to consider what hath at any time been claimed or pretended to belong to their jurisdiction by the officers and judges of those respective courts, but what the common law allows and permits to be so. For these eccentrical tribunals (which are principally guided by the rules of the imperial and canon laws), as they subsist and are admitted in England, not by any right of their own, but upon bare sufferance and toleration from the municipal laws, must have recourse to the laws of that country wherein they are thus adopted to be informed how far their jurisdiction extends, or what causes are permitted and what forbidden to be discussed or drawn in 'question before them. It matters not what the Pandects of Justinian or the Decretals of Gregory have ordained; they are of no more intrinsic authority than the laws of Solon or Lycurgus; curious, perhaps, for their antiquity, respectable for their equity, and frequently of admirable use in illustrating a point of history. Nor is it at all material in what light other nations may consider this matter of jurisdiction. Every nation must and will abide by its own municipal laws, which various accidents conspire to render different in almost every country in Europe. We permit some kinds of suits to be of ecclesiastical cognizance which other nations have referred entirely to the temporal courts, as concerning wills and successions to intestates' chattels; and perhaps we may, in our turn, prohibit them from interfering in some controversies which, on the Continent, may be looked upon as merely spiritual. In short, the common law of England is the one uniform rule to determine the jurisdiction of our courts; and if any tribunals whatsoever attempt to exceed the limits so prescribed to them, the king's courts of common law may and do prohibit them, and in some cases punish their judges." So far, then, as the opinions of Hale and Blackstone are entitled to respect, — so far as the writings and decisions of the venerable expounders of the British constitution to which they refer may be regarded as authority, — the origin and powers of the admiralty in England, the subjects permitted to its peculiar cognizance, the control exerted to restrict it to that peculiar cognizance by the common law tribunals, would seem not to be matters of uncertainty. Sir William Blackstone, too, is a writer of modern date, and, as such, his opinions may claim exemption from the influence of conflict

of bigotry or prejudice, which the advocates of the admiralty seem disposed to attribute to the opinions or the times of Spelman, of Fortescue, and Coke.

Passing from the testimony of the writers already mentioned, let us call in a witness as to the admiralty powers and jurisdiction, as existing in England for a century past, at least, whom no one will suspect of disaffection to that jurisdiction. I allude to Mr. Arthur Browne, Professor of Civil Law in the University of Dublin, in whose learned book scarcely any assertion of power ever made by the admiralty courts, however reprobated and denied by the common law tribunals, is not commended, if not justified, and scarcely one retrenchment or denial of power to the former is not as zealously disapproved. Let us hear what this witness is compelled, though *multo cum gemitu*, to admit, with respect to the jurisdiction of the instance court in cases civil and maritime, — cases identical in their character with that now under consideration. After dilating upon the resolutions of 1632, and upon what by him are designated as the irresistible arguments of Sir Leoline Jenkins in favor of the powers of his own court, Professor Browne is driven to the following concessions. Of the common law courts he says (Vol. II. p. 74), — " Adhering on their part to the strict letter of the rule, that the business of the admiralty was only with contracts made upon the sea, they here took locality as the only boundary, though in the instances before mentioned, of contracts made on sea, they refused this limit; and having insisted, as indeed Judge Blackstone has even of late done, that contracts upon land, though to be executed on the sea, and contracts at sea, if to be executed on land, were not cognizable by the admiralty, they left to it the idle power of trying contracts made upon the sea to be also executed upon the sea, of which one instance might not happen in ten years." Again (p. 85), speaking of what he characterizes as " the torrent of prohibitions which poured forth from the common law courts," he tells us, that " little was left for the authority of the admiral to operate upon, in the subject of contracts, amidst those curbs so eagerly and rapidly thrown upon him in the last century, save express hypothecations of ship or goods made at sea or in foreign ports, and suits for seamen's wages." At the close of this chapter on the jurisdiction of the instance courts, Mr. Browne presents his readers with the general conclusion to which his investigations on this head had conducted him, in the following words: — " The result of our inquiries in the present chapter, as to the extent of the jurisdiction of the instance court of admiralty which is at present seemingly allowed by the common law courts, is, that it is confined in matters of

34 *

contract to suits for seamen's wages (on all hands admitted to be an exception to the rule restricting the admiralty to the sea), or. to those on hypothecations. In matters of tort, to actions for assault, collision, and spoil, and in quasi contracts, to actions by part-owners for security, and actions of salvage ; but if a party," says he, " institute a suit in that court on a charter-party, for freight, in a cause of average and contribution, or to decide the property of a ship, and be not prohibited, I do not see how the court could refuse to retain it." In this concluding passage from Mr. Browne's chapter on the jurisdiction of the instance courts, there are two circumstances which impress themselves upon our attention, as seemingly, indeed palpably, irreconcilable with the law or with each other. The first is the concession (a concession said to be made upon a general survey of the subject) as to the limit imposed by the common law tribunals upon the admiralty ; the second, the opinion, in the very face of this concession, that the admiralty, if it should not be actually prohibited, if it could only escape the vigilance of the common law courts, might proceed, might make an incursion within this established, this prohibited, nay, conceded boundary. Opinions like these evince an adherence to the admiralty apparently extreme, and almost contumacious ; and. it may be owing to this devotion, that decisions have been pressed into its support, which, to my apprehension, do not. come directly up to the point they are called to fortify, or, if they did, are too few in number and too feeble to remove the firmly planted landmarks of the law. Thus the case of Menetone *v.* Gibbons, 3 T. R. 267, is cited as authority that the admiralty has cognizance over contracts, though executed on land and under seal.. This case, it is true, is somewhat anomalous in its features, but yet it is thought that no fair exposition of it can warrant the conclusions attempted to be deduced from it. Notwithstanding some expressions which may have fallen from some of the judges *arguendo*, it is certainly true, that every justice who decided that case put his opinion essentially upon these foundations : — that the. case was one of a hypothecation of the ship, in the course of a foreign voyage, by the master, who had a right to hypothecate ; that the contract provided for or gave no remedy except *in rem*, whereas the common law courts proceed against the parties only ; that if the court should decide against the admiralty jurisdiction (and this, too, after a sentence of condemnation and sale of the ship), being unable to give any redress under the contract by proceeding *in rem*, the party making the advances would be irreparably injured. This case should be expounded, too, in connection with that of Ladbroke *v.* Crickett, decided by the same judges twelve

months previously (2 T. R. 649), in which a natural distinction is taken between the extent of the right to prohibit the jurisdiction of the admiralty before sentence, and the right to impeach its proceedings after they are consummated and carried into execution without interference. In the latter case, Buller, whose remarks have been quoted from Menetone v. Gibbons, says (p. 654) : — " There is a great difference between applications to this court for prohibitions to the admiralty pending the suit and after sentence : in the first case, this court will examine the whole case, and see the grounds of the proceedings in the admiralty : but the rule is quite the reverse after sentence is passed : in such a case, they will not look out of the proceedings ; for the party who applies for a prohibition after sentence must show a nullity of jurisdiction on the face of the proceedings ; therefore the plaintiff in this case could not go into evidence at the trial to impeach the decree of the court of admiralty. The case states, in general terms, that that court did pronounce a decree for the sale of the ship in question, and that a warrant issued out of that court for seizing and selling the ship. So that we must take it that they had jurisdiction, for nothing appears on the face of the decree to show that they had not." Showing conclusively, that this case determined nothing as to the original legitimate powers either of the common law or admiralty tribunals, but positively refusing to institute a comparison between them. The next case adduced by Mr. Browne, and the last which I shall notice, is that of Smart v. Wolff, 3 T. R. 323. The first remark which is pertinent to this case is, that it was a case of prize, one of a class universally admitted to belong peculiarly and exclusively to a court of admiralty ; and the question propounded in it, and the only question, was as to the proceeding practised by the court for carrying into effect this its undoubted jurisdiction. There the goods had been, by an interlocutory order, delivered to the captors, upon a stipulation to respond for freight, if allowed on the final decree ; and the amount of freight ultimately allowed being greater than that covered by the stipulation, the court, by a proceeding substantially *in rem*, ordered the captors to bring in so much of the cargo as would be equal to the excess of the allowance beyond the amount of the stipulation. A rule for a prohibition obtained from the King's Bench was, upon full argument, discharged, and the grounds of the court's decision are fully disclosed in the opinion of all the judges, in accordance with the reasoning of Mr. Justice Buller, who is here particularly quoted because he has been referred to as favorable to the doctrines of Mr. Browne, and who thus expresses himself : — " Every case that I know on the subject is a

clear authority to show that questions of prize and their consequences are solely and exclusively of the admiralty jurisdiction. After the cases of Lindo *v.* Rodney, Le Caux *v.* Eden, and Livingston *v.* McKenzie, it would only be a waste of time to enter into reasons to show that this court has no jurisdiction over those subjects. Still less reason is there for saying, that the admiralty shall be prevented from proceeding after it has made an interlocutory decree; because that would be to say, that the admiralty has jurisdiction at the beginning of the suit, and not at the end of it." The case of Smart *v.* Wolff, then, is assuredly no direct authority, if authority at all, to sustain the theory or the partialities of Professor Browne. Indeed, the utmost that can be drawn from this case in favor of those theories is an expression of belief, by Justice Buller, that my Lord Coke entertained not only a jealousy of, but an enmity against, the admiralty; a belief which, whether well or ill founded, must be equally unimportant, — equally impotent to impugn an inveterate, a confirmed, nay, an admitted course and body of jurisprudence. Upon a review of all the authorities to which I have had access, the conclusion of my mind is certain and satisfactory, that, with some temporary deviations, or irregularities, such as the resolutions of 1632, the jurisdiction of the instance court of the admiralty, both by the common law and by the statutes of 13 and 15 Richard II., down to the period at which, during the reign of the present queen, that jurisdiction was enlarged, was, in matters of contract (with the known exception of seamen's wages), limited to maritime contracts made and to be executed upon the high sea, and to cases of hypothecation of the ship upon her voyage; and in matters of civil tort, to cases also occurring upon the sea, without the body of the county. But this restriction upon the jurisdiction of the instance courts of England, so uniformly maintained by the common law courts of that country, — acknowledged, however condemned, by Mr. Browne, and admitted in argument in this case, — it is contended, does not apply to the powers and jurisdiction of the like courts in the United States, and did not apply at the period when the Federal Constitution was adopted, but that a jurisdiction more varied and enlarged, as practised in the British colonies in North America, and under the general confederation at the adoption of the Constitution, was in the contemplation of the framers of this Constitution, and must therefore be referred to as the measure of the powers conferred in the language of the second section of the third article, — "all cases of admiralty and maritime jurisdiction." In testing the accuracy of these positions, it would be asking too much of this court to receive as binding authority the decisions of

tribunals inferior to itself, farther than they rest upon indisputable and clear historical truths in our colonial history; truths, too, which shall sustain a regular and recognized system of jurisdiction. It will not be sufficient to allege some obscure, eccentric, or occasional exertions of power, if they could be adduced, and upon these to attempt to build up an hypothesis or a system; — nay, more, to affirm them to be conclusive proofs of a system established, general, well known to and understood by the framers of the Constitution, and therefore entering necessarily into their acceptation of the terms "admiralty and maritime jurisdiction." The danger of yielding to such scanty and inadequate testimony must be obvious to every mind. The still greater danger of theorizing upon words not of precise or definite import, freed from the restraints of settled acceptation, has been exemplified in our own time and country, in an able, learned, and ingenious effort to confer on the admiralty here powers not merely coextensive with the most ambitious pretensions of the English admiralty at any period of its existence, but powers that may be derived from the laws and institutions of almost every community of ancient or modern Europe, and covering, not only seas and navigable waters, but men and their transactions having no necessary connection with waters of any description, viz. shipwrights, material men, and insurers (*vide* 2 Gall. 397); and this upon the assumption, that the term *maritime* implied more than the word *admiralty*, when unassociated with it, and that this was so understood by the framers of the Constitution, who designed it as an enlargement of the admiralty power. Yet if we turn to the language of Mr. Justice Blackstone, Vol. III. p. 106, he tells us that the courts maritime are the admiralty courts, using the terms *maritime* and *admiralty* as convertible; and that the injuries triable in the admiralty (or maritime causes) are such as are of common law cognizance, yet, being committed on the high seas, are therefore to be tried by a peculiar court. Again, p. 68, he says, — "The maritime courts, or such as have power and jurisdiction to determine all maritime injuries arising upon the seas, or in parts out of the reach of the common law, are only the court of admiralty and its court of appeal." So, likewise, Sir Matthew Hale, p. 50, in characterizing maritime contracts to be those made and to be executed upon the sea, certainly excludes any implication beyond these; and this must be taken as the English interpretation of the term *maritime*, by which it is understood as identical with *admiralty*.

And here it seems proper to remark, that I cannot subscribe to the opinion, either from the bench or the bar, that the decisions of inferior courts, which it is not merely the right, but

the duty, of this tribunal to revise, should, by their intrinsic authority as decisions, be recognized as binding on the judgment of this court. They are entitled to that respect to which their accuracy, when examined, may give them just claims; but it is surely a perversion of our judicial system to press them as binding merely because they have been pronounced. If these decisions can be appealed to upon the mere force of their language, I would quote here the words of Judge Washington, in the case of the United States *v.* Gill, 4 Dall. 398, where he declares, that "the words of the Constitution must be taken to refer to the admiralty and maritime jurisdiction of England, from whose code and practice we derive our systems of jurisprudence, and obtain the best glossary." Nor am I disposed to consider the doctrine of the civil law which has been mentioned, to escape from the silence of our own code or that of England upon the subject.

I do not contest the position, that the established, well-defined, regular, and known civil jurisdiction of the admiralty courts of England, or of the vice-admiralty courts of the American colonies, was in the contemplation of the men who achieved our independence, and was adopted by those who framed the Constitution. I willingly concede this position. That which I do resist is what seems to me an effort to assert, through the colonial vice-admiralty courts, powers which did not regularly inhere in their constitution; powers which, down to the date of the quarrel with the mother country, were never bestowed on them by statutory authority; powers which to their superior — from whom they emanated, and to whom they were inferior and subordinate, the High Court of Admiralty — had long been conclusively denied, as has been already abundantly shown. With respect to the establishment and powers of these courts, we are informed by Browne, 2 Civ. and Adm. Law, 490, that "all powers of the vice-admiralty courts within his Majesty's dominions are derived from the high admiral, or the commissioners of the admiralty of England, as inherent and incident to that office. Accordingly, by virtue of their commission, the lords of the admiralty are authorized to erect vice-admiralty courts in North America, the West Indies, and the settlements of the East India Company"; "and in case any person be aggrieved by sentence or interlocutory decree having the force of a sentence, he may appeal to the High Court of Admiralty." Blackstone, also, says (Vol. III. p. 68), — "Appeals from the vice-admiralty courts in America, and our other plantations and settlements, may be brought before the courts of admiralty in England, as being a branch of the admiral's jurisdiction." Stokes, in his View of

the Constitution of the British Colonies in North America, speaking of the vice-admiralty courts, says (chap. 13, p. 271), — "In the first place, as to the jurisdiction exercised in the courts of vice-admiralty in the colonies, in deciding all maritime causes, or causes arising on the high seas, I have only to observe, that it proceeds in the same manner that the High Court of Admiralty in England does." Again (p. 275), he says, — "From the courts of vice-admiralty in the colonies, an appeal lies to the High Court of Admiralty in England." Mr. Browne, in his second volume of Civ. and Adm. Law, p. 491, accounts for the jurisdiction of the vice-admiralty courts in America, in revenue causes, by tracing it to the statute of 12 Charles II. commonly called the Navigation Act, and to statutes 7th and 8th of William III., c. 22, and designates this as totally foreign to the original jurisdiction of the admiralty, and unknown to it. With this view of the origin and powers of the vice-admiralty courts of the colonies, showing them to be mere branches, parts of the admiralty, and emanating from and subordinate to the latter, it would seem difficult to perceive on their part powers more comprehensive than those existing in their creator and superior, vested, too, with authority to supervise and control them. The existence of such powers certainly cannot rest upon correct logical induction, but would appear to be at war equally with common apprehension and practical execution. Power can never be delegated which the authority said to delegate itself never possessed, nor can such power be indirectly exercised under a pretext of controlling or supervising those to whom it could not be legitimately delegated. The colonial vice-admiralty courts, as regular parts of the English admiralty, created by its authority, could by their constitution, therefore, be invested only with the known and restricted jurisdiction of the former. If a more extended jurisdiction ever belonged to, or be claimed for, these colonial tribunals, it must rest on some peculiar and superadded ground, which it is incumbent on the advocates of this jurisdiction clearly to show. Has any thing of the kind been adduced in the argument of this cause? Beyond the provisions of the statutes of Charles II. and William III., relative to cases of revenue, has there been shown any enlargement by statute of these vice-admiralty powers, any alteration by judicial decision in England of the constitution and powers of the vice-admiralty courts, as emanating from, and limited by, the jurisdiction of the admiralty in the mother country? Strongly as authority for the affirmative of these inquiries has been challenged, nothing satisfactory to my mind, nothing, indeed, having the appearance of authority, has been adduced; because, I take it

for granted, from the distinguished ability of the counsel, such authority was not attainable. The learned and elaborate investigations of the counsel for the appellants have brought to light a series of proofs upon the jurisdiction of the vice-admiralty courts, all in strict accordance with the positions laid down in Blackstone, Stokes, and Browne, and exemplifying beyond these the actual and practical extent and modes to which and in which that jurisdiction was permitted and carried into operation in the Colonies. These developments are valuable as illustrations of our early history, but they are still more so to the jurist seeking to ascertain the boundaries of right amidst contested limits of power. A recapitulation of them here would require an inconvenient detail. They well deserve, nevertheless, to be preserved and remembered, as showing incontestably, with the exception of revenue cases arising under the statutes of Charles and of William, and designated on all hands as "totally foreign to the original jurisdiction of the admiralty, and unknown to it," that the constitution and functions of the vice-admiralty courts, from the earliest notices of their existence, in the American colonies, were modelled upon and strictly limited to those of the mother country (of which they were branches or portions); that, so far from there having grown up a more enlarged and general jurisdiction in the colonial vice-admiralty courts, — a jurisdiction known and acquiesced in, — every effort on their part to transcend the boundary prescribed to their superior in the mother country was watched with jealousy by the common law tribunals, and by them uniformly suppressed. Coming down to the periods immediately preceding the Revolutionary conflict, and embraced by the war, and during the existence of the Confederation, the volumes of testimony poured forth in the forms of essays, speeches, and resolutions prove that the pretensions then advanced by the British government, through the medium of the admiralty jurisdiction, extending that jurisdiction beyond its legitimate province as an emanation from the admiralty at home, so far from being regarded as pertaining to a known and established system, were received as novelties and oppressions, — as abhorrent to the genius of the people, to the British constitution itself, and worthy to be repelled even by an appeal to arms. It would seem, then, reconcilable neither with reason nor probability, that the men who made these solemn protests, — that a community still warm from the contest induced by them, — should, upon their emancipation from evils considered intolerable, immediately, by a species of political suicide, rivet those same evils indissolubly upon themselves. Much more reasonable does it appear to me, that the statesmen who framed

our national charter, when conferring the admiralty and maritime jurisdiction, had in their contemplation that jurisdiction only which was familiar to themselves and their fathers, was venerable from time, and in practice acceptable to all; they could not have intended to sanction that whose very existence they denied.   This view of the question is further fortified by the opinion of two able American jurists, both of them contemporaneous with the birth of our government.   I allude to the opinion of Chancellor Kent, expressed at page 377 of the first volume of his Commentaries, 5th edit., and to that of Mr. Dane, found in volume sixth of his Abridgment, p. 353.   It is in close conformity to, and congenial with, the seventh amendment of the Constitution, and with the saving in the Judiciary Act of the right to a remedy at common law, wherever the common law should be competent to give it.   An able illustration of the construction here contended for may also be seen in the elaborate opinion of the late Justice Baldwin in the case of Bains v. The Schooner James and Catharine, Baldwin's Reports, 544, where the learned judge, in support of his conclusions, with great strength of reasoning, and upon authority, expounds the term "suits at common law," in the seventh amendment of the Constitution, and the phrase, "the right to a common law remedy where the common law is competent to give it," contained in the saving in the ninth section of the Judiciary Act, showing their just operation in limiting the admiralty within proper bounds.   I deem it wholly irregular to attempt to adduce general admiralty powers from the cognizance vested in the courts as to seizures; these are purely cases of revenue, are treated in England as anomalous, and as not investing general admiralty jurisdiction, but as unknown to it; or jurisdiction in cases of contract, as between private persons.   This interpretation disposes at once of all the conclusions which it is attempted to draw from the several cases of seizure decided in this court.   The *obiter dictum* in the case of the General Smith ought not to be regarded as authority at all, much less as laying the foundation of a system.   From the best lights I have been able to bring to the inquiry before us, reflected either from the jurisprudence of the mother country, from the history of the colonial government, or the transactions of the general Confederation, I am satisfied that the civil, admiralty, and maritime jurisdiction conferred by the second section of the third article of the Constitution was the restricted jurisdiction known to be that of the English admiralty, insisted upon and contended for by the North American colonies, limited in matters of contract (seamen's wages excepted) to things agreed upon and to be performed upon the sea, and cases of hy-

pothecation, and in civil torts to injuries occurring on the same theatre, and excluded as to the one and the other from contracts made, or torts committed, within the body of a county.

It has been urged in argument, that the restriction here proposed is altogether unsuited to and unworthy the expanded territory and already great and increasing commerce of our country. To this may be replied the fact, that it was thought sufficiently broad for a nation admitted even at this day to be the most commercial on the globe. In the next place, I am by no means prepared to concede that the interests of commerce, and certainly other great interests in society, are to be benefited by incursions upon the common law jurisprudence of the country. Recurring, as a test, to the institutions and to the condition of various nations, a very different and even opposite conclusion would be impressed by it. But even if it be admitted that a power in the admiralty such as would permit encroachments upon the venerable precincts of the common law would be ever so beneficial, the reality of such advantage, and the right or power to authorize it, are essentially different concerns. An argument in favor of power founded upon calculations of advantage, in a government of strictly delegated powers, is scarcely legitimate when addressed to the legislature; addressed to the judiciary, it seems to be especially out of place. In my view, it is scarcely reconcilable with government in any form, so far as this term may signify regulated power, and ought to have influence nowhere. If a restricted admiralty jurisdiction, though ever so impotent for good or prolific of inconvenience, has been imposed by the Constitution, either or both those evils must be of far less magnitude than would be attempts to remedy them by means subversive of the Constitution itself, by unwarranted legislative assumption, or by violent judicial constructions. The pressure of any great national necessity for amendments of that instrument will always insure their adoption.

To meet the objection urged in this case to the jurisdiction deduced from the character of the contract sued on, it has been insisted that the foundation of this suit may be treated as a marine tort, which, having been committed on Long Island Sound, and therefore not within the body of any county, is exempt from objection on the score of locality. If the pleadings and proofs in this cause presented a case of simple or substantial tort, occurring without the body of a county, no just objection could be made to the jurisdiction. It is, therefore, proper to inquire whether a case of marine tort, in form or in substance, is presented upon this record. There is a class of cases known to the common law, in which a plaintiff having

a right of action arising upon contract may waive his remedy directly upon the contract in form, and allege his gravamen as originating in tort, produced by a violation or neglect of duty. The cases in which this alternative is permitted are, in the first place, those in which, independently of the rights of the plaintiff arising from express stipulations with the defendant, there are duties or obligations incumbent on the latter resulting from the peculiar position he occupies with respect to the public, giving the right to redress to all who may suffer from the violation or neglect of these public obligations. Such are the instances of attorneys, surgeons, common carriers, and other bailees. The wrong in these instances is rather the infringement of these public and general obligations, than the violation of the private direct agreement between the parties; and *agreement, contract,* is not the foundation of the demand, nor can it be properly taken as the measure of redress to be adjudged; for I presume it is undeniable, that, if the relations of the parties are the stipulations of their contract exclusively or essentially, their remedies must be upon such stipulations strictly. Secondly, they are cases in which a kind of *quasi* tort is supposed to arise from a violation of the contract immediately between the parties. These cases, although they are torts in form, are essentially cases of contract. The contract, therefore, must be referred to, and substantially shown, to ascertain the rights of the parties, and to measure the character and extent of the redress to either of them. It can in no material feature be departed from. This I take to be the *rationale* of the practice, and the view here taken appears to be sustained by authority. Thus, in Boorman *v.* Brown, 3 Adolph. & Ellis, 525, New Series, Tindal, C. J., delivering the opinion of all the court, says,— "That there is a large class of cases in which the foundation of the action springs out of the privity of contract between the parties, but in which, nevertheless, the remedy for the breach or non-performance is indifferently in assumpsit, or in case upon tort, is not disputed." Again (p. 526), the same judge says,— "The principle in all these cases would seem to be, that the contract creates a duty, and the neglect to perform that duty, or the non-performance, is a ground of action upon tort." In the case of Winterbottom *v.* Wright, 10 Mees. & Wels. 114, Lord Abinger thus states the law:— "Where a party becomes responsible to the public by undertaking a public duty, he is liable, though the injury may have arisen from the negligence of his servant or agent; so, in cases of public nuisances, whether the act was done by the party or a servant, or in any other capacity, you are liable to an action at the suit of any person who suffers. These, however, are

cases where the real ground of the liability is the public duty, or the commission of the public nuisance. There is also a class of cases, in which the law permits a contract to be turned into a tort; but unless there has been some public duty undertaken, or public nuisance committed, they are all cases in which an action might have been maintained upon the contract; but there is no instance in which a party who was not a privy to the contract entered into with him can maintain any such action." And Alderson, Baron, in the same case says, — "The only safe rule is, to confine the right to recover to those who enter into the contract. If we go one step beyond that, we may go fifty." So, too, in Tollit *v.* Sherstone, 5 Mees. & Wels. 283, a case in tort, Maule, Baron, says, — "It is clear that an action of contract cannot be maintained by a person who is not a party to the contract; and the same principle extends to an action arising out of the contract." In farther proof that these actions in form *ex delicto*, founded on breach of contract, are essentially actions of contract, it is clear that, in such actions, an infant could not be debarred the privilege of his nonage, nor could the operation of the statute of limitations upon the true cause of the action be avoided; both these defences would apply, according to the real foundation of the action.

With respect to these cases *ex delicto quasi ex contractu*, as they have been called, it has been ruled, that if the plaintiff states the custom, and also relies on an undertaking general or special, the action is in reality founded on the contract, and will be treated as such. *Vide* Orange County Bank *v.* Brown, 3 Wendell, 158.

If the practice of the common law courts above considered be at all applicable to suits in the admiralty, how would it operate upon the case before us? In this case, as presented on the face of the libel, or upon the proofs adduced in its support, either formally or substantially a case founded solely on public duty, or upon contract between the parties? It would seem to be difficult, in any form of words, to state a contract more express than is set out in the libel in this cause. It is true that in the first article there is a statement that the respondents were common carriers of merchandise between the city of New York and the town of Stonington in Connecticut, but it is nowhere alleged that the property of the complainants was delivered to the respondents as common carriers, or was received by them in that character, or under any custom or obligation binding them as carriers. So far from this, it is averred in the second article of the libel, that the complainants *contracted* on a particular day, and at a particular place, and

that at that very place, and on that very day, the respondents contracted with the libellants, for a certain reward and hire to be paid, to transport the said merchandise, &c., — mutual and express stipulations set forth. Is this the statement of a general custom, a responsibility accruing from implied public duties, or is this not rather the exclusion of every thing of the kind? Again, article third of the libel avers, that on the day and at the place mentioned in the second article, viz. on the 13th day of July, 1840, at the city of New York, the libellants delivered to the respondents their merchandise, and it was received by the latter, to be transported according to the agreement between them. If, then, the power of proceeding in tort for a breach of the contract, known to the common law courts, can be extended to the admiralty, it would still, as in the former tribunals according to the authorities, present every question for decision as a question of contract, between parties (and because they were so) to the contract, by the stipulations according to which alone the rights and wrongs of all must be adjusted. This election of the proceeding in tort arising *ex contractu,* if permitted to the admiralty, would leave the subject of jurisdiction just where it would stand independently of such election. In the exercise of such election, you are necessarily driven to the contract to ascertain the existence, the nature, and extent of the assumed tort, in other words, the infraction or fulfilment of the contract, and the investigation develops inevitably an agreement, of which, with respect to parties, to locality, or subject-matter, or to all these, the admiralty can have no cognizance.

But after all, I would inquire for the authority under which the admiralty has been allowed to assume, under an artificial rule of common law pleading, jurisdiction of matters not falling naturally, directly, and appropriately within its cognizance. Indeed, its admirers and advocates, from Sir Leoline Jenkins to Professor Browne, have zealously defended it against every imputation of attempts at assumption, insisting that the subjects claimed for its cognizance, and its modes of claiming them, were such only as naturally and appropriately belonged to it. They have as zealously complained of abstractions by the common law courts, by means of uncandid and unreasonable fictions, of matters naturally and familiarly belonging to the admiralty. If a single precedent exists showing that, by the artificial rules of pleading practised in the common law courts, partaking in some degree of fiction, the admiralty has ever obtained jurisdiction over matters which otherwise would not have fallen within its cognizance, that precedent is unknown to me; and it is equally certain that I am unwilling to

35 *

create one.   And it is remarkable, that, in direct opposition to this effort to give jurisdiction to the admiralty by borrowing a license from the common law courts, we have the explicit declaration of Professor Browne himself, amidst all his partiality, that in matters of tort the jurisdiction of the admiralty is limited to " actions for assault, collision, and spoil," — instances of pure tort, excluding every idea of fiction, and equally excluding one single attribute of contract.    *Vide* Vol. II., chap. 4, p. 122.

I am extremely diffident as to the wisdom and safety of enlarging a jurisdiction, (and especially by the force of implication,) which from the earliest traces of its existence (whatever has been said in this case about the power of reform in this respect) has always been exercised by rules and principles less congenial with our institutions that are the principles and proceedings of the common law; which, by the mere force of implication in the terms " admiralty and maritime," overrides the seventh amendment of the Constitution, and the important saving in the ninth section of the Judiciary Act; which by a like implication frees itself altogether from all restriction imposed, both by the second section of the third article of the Constitution, and by the eleventh section of the Judiciary Act, *with respect to controversies between citizens of the same State.*    A jurisdiction substituting, too, for the invaluable safeguard to truth secured by confronting the witness with court and jury, a machinery by which the aspect and the force of testimony are graduated rather by the address and skill of the agents employed to fabricate it, than by its own intrinsic worth, and transferring the trial of facts resting upon credibility to a tribunal often remote and inconvenient, and constrained to decide on statements that may be merely colorable, often entirely untrue.

Again, to decide this case upon the ground of liability of the owners for a tort committed by the master, would present this strange incongruity.   Although, by the common law, owners of vessels were responsible for losses occasioned by the misconduct of masters as their agents, to the full amount of such losses, yet as long since as the statute of 7 George II., passed in 1734, nearly forty years before our independence, this responsibility was expressly limited in extent to the value of the vessel and the freight.   The laws of Oleron and Wisby, we are told by Lord Tenterden (*vide* Treatise on Shipping, p. 395), contain no provision on this subject, though this writer informs us, upon the authority of Vinnius, that such a provision was contained in the laws of Holland, and that by the laws of Rotterdam, as early as 1721, the owners were exempted from liability for the acts of the master done without their

order farther than their part of the ship amounted to. By the French Ordonnance of the Marine, Book 2, tit. 8, art. 2, the rule is thus given : — " Les propriétaires des navires seront responsable des faits du maître ; mais ils en demeureront déchargés en abandonnant leur bâtiment et le fret." So, too, Boulay-Paty, in his work entitled Cours de Droit Commercial Maritime, Vol. I. pp. 270 *et seq.*, after interpreting the word *fait* or act of the master as inclusive of *delicta quasi delicta*, acts of negligence or imprudence, as well as his contracts or *engagements*, upon a comparison of the opinions of various authors, — Valin, Emerigon, Pothier, &c., — comes to the following conclusions : — " Maintenant, disons donc que le capitaine, soit par emprunt, soit par vente de marchandises, soit par *délit* ou quasi-délit, n'a que le pouvoir d'engager le navire et le fret, sans qu'il lui soit *possible* de compromettre la fortune de terre de ses armateurs. Ceux-ci se dégagent de toutes les obligations contractées par le maître, en cours de voyage, par l'abandon du navire et du fret." This same writer, pages 275 and 276, lays down the following doctrines, which he quotes from Grotius, from Emerigon, from Pothier, and from the Consulat de la Mer : — " L'obligation où les propriétaires sont de garantir les *faits* de leur capitaine, est plus réelle que personnelle. . . . Pendant le cours du voyage, le capitaine pourra prendre deniers sur le corps, mettre des apparaux en gage, ou vendre des marchandises de son chargement. Voilà tout. Son pouvoir légal ne s'étend pas au-delà des limites du navire dont il est maître, c'est-à-dire administrateur ; il ne peut engager la fortune de terre de ses armateurs qu'autant que ceux-ci y ont consenti d'une manière spéciale. . . . De sorte que si le navire périt, ou qu'ils abdiquent leur intérêt, ils ne sont garans de rien. . . . En effet, le Consulat de la Mer, cap. 33, après avoir dit que l'intérêt que les armateurs ont sur le corps, est engagé au paiement des dettes contractées par le capitaine, en cours de voyage, ajoute que la personne ni les autres biens des coproprietaires ne sont obligés, à moins qu'ils ne lui eussent donné, à ce sujet, un pouvoir suffisant.

" Au ch. 236 il est dit que si le navire périt, c'est assez que cette perte soit pour le compte des quirataires."

From this view of the law as existing in England and on the European continent, it is manifest, that, in the former country, the responsibility of the owners, prior to the statute of 7 Geo. II., was a common law liability, and was acknowledged and allowed to the full extent that the demand could be proven, embracing both the persons and all the property of the owners ; that since the statute of Geo. II., this liability is limited to the value of the ship and freight, but still to be en-

forced in the courts of common law or equity; that, by the maritime law of the Continent, the liability of the owners was always limited to the ship and freight, and that, from this restricted liability, the owners were entirely released by an abandonment of ship and freight, or by a total loss of the former at sea, whether the claim was made on account of the contract, or tort, or *delictum* of the master. But, in this case, the court have sanctioned a liability resting upon common law principles, irrespective of any limit imposed either by statute or by the rules of the maritime law, and this by means, too, of artificial or fictitious constructions, practised upon only in the courts of common law, relative to the forms of actions prosecuted in those courts; and, for the accomplishment of this object, have permitted the adoption of modes and proceedings peculiarly and solely appertaining to the maritime law, — a system of jurisprudence essentially dissimilar, a system which recognizes no such claim as the present, but under whose authority the owners would be wholly absolved by the total loss of the vessel, and under which they would be permitted to stipulate for their own exemption from liability on account of the barratry or dishonesty of their agents. *Vide* Abbott on Shipping, p. 294. The incongruity here pointed out might have been avoided, by confining the parties to their proper forum.

My conclusions, then, upon the question of jurisdiction, are these: — that the case presented by the libel is palpably a proceeding *in personam* upon an express contract, entered into between the parties in the city of New York; that it is therefore a case properly cognizable at a common law court, for any breach of that contract which may have been committed, and consequently is not a case over which the admiralty court can, under the Constitution and laws of the United States, have jurisdiction, either *in personam* or *in rem.*

Having felt myself bound to treat at some extent what seemed to me the decisive, and what may, too, be called the public or constitutional question involved in this cause, — the question of jurisdiction, — as to what may be the merits of this controversy, the obligations sustained by the parties to each other, and the extent to which these have been fulfilled or violated, I shall content myself with simply giving the conclusions to which my mind has been conducted, without pretending to reason them out fully upon the facts or the law of the case, because those conclusions would not be the grounds of a formal dissent, though disaffirmed by a majority of my brethren.

Whilst I am impressed with the strong necessity that exists

for guarding against fraud or neglect in those who, by holding themselves forth as fitted to take charge of the lives, the health, or the property of the community, thereby invite the public trust and reliance, I am not prepared to say that there can be no limit or qualification to the responsibility of those who embark in these or similar undertakings, — limits which may be implied from the inherent nature of those undertakings themselves, or which may result from express stipulation. It seems to me undeniable, that a carrier may select the particular line or description of business in which he engages, and that, so long as he with good faith adheres to that description, he cannot be responsible for any thing beyond or inconsistent with it. The rule which makes him an insurer against every thing but the act of God or the public enemy makes him an insurer as to performances only which are consistent with his undertaking as carrier. A common carrier of travellers is bound to the preservation of the accustomed baggage of the traveller, because of the known custom that travellers carry with them articles for their comfort and accommodation, and the price for which the transportation is undertaken is graduated on that presumption; but the carrier would not therefore be responsible for other articles, of extraordinary value, secretly transported upon his vehicle, because by this secrecy he is defrauded of a compensation commensurate with the value of the subject transported, and with the increased hazards to which it is attempted to commit him without his knowledge or assent. But to render him liable, he must have received the article for transportation, and it must be a subject falling fairly within the scope of his engagement. Within this range he is an insurer, with the exceptions above stated. But a carrier may, in a given case, be exempted from liability for loss, without fraud, by express agreement with the person for whom he undertakes; for I cannot well imagine a principle creating a disability in a particular class of persons to enter into a contract fraught with no criminal or immoral element, — a disability, indeed, extending injuriously to others, who might find it materially beneficial to make a contract with them. A carrier may also be exempted from liability by the conduct of the owner of property, in keeping the exclusive possession and control of it, and thereby withholding it from the care and management of the carrier. Upon applying the principles here succinctly stated to the evidence in this cause, it is not made out in proof, to my mind, that the respondents ever received, as carriers, from the libellants, or indeed in any other capacity, property of any species or description, or ever knew that property of the libellants was directly or indirectly, within the possession of the respondents, or on

board their vessel. It is not in proof that Harnden, in his contract with the respondents, acted as the agent of the libellants or for their benefit, or that, at the time of the agreement or of the shipment made by Harnden, the libellants and respondents were known to each other by transactions as shipper and carrier. It is established by proof, that Harnden contracted, in his own name and behalf alone, with the respondents for a separate compartment on board their vessel, to be, with its contents (the latter unknown to the respondents), at all times under his exclusive control; that the property alleged to have been lost was, if in this separate compartment, placed there without certain knowledge of its character or value on the part of the respondents, was under the exclusive direction of Harnden, who accompanied it, and who, up to the time of the conflagration of the vessel, held the property under lock and key, and could alone, without violence and a breach of the engagement, have had access to it. Were this controversy directly between Harnden and the respondents, from the peculiar nature of the contract between these parties, and from the possession of the subject reserved to and exercised by the former, any liability of the respondents, even then, might be a matter of doubt; but there should, I think, be no difficulty in concluding that no kind of liability could attach to the respondents in favor of persons for whom they had undertaken no duty, and who, in reference to the transaction in question, were strangers, entirely unknown to them. Upon the merits of this case, as well as upon the question of jurisdiction, I think the decree of the Circuit Court ought to be reversed, and the libel dismissed.

Mr. Justice WOODBURY.

On most of the facts involved in this libel, little controversy exists. It is certain that the respondents took the property of the plaintiffs on board their steamboat, the Lexington, to carry it, on her last calamitous voyage, the 13th of January, 1840, from New York to Stonington. It is equally certain that it was lost on that voyage, in Long Island Sound, at a place where the tide ebbed and flowed strongly, and several miles from shore, and probably without the limits of any State or county. It is certain, likewise, that the property was lost in consequence of a fire, which broke out in the boat in the night, and consumed it, with most of the other property on board. The value of it is also sufficiently certain, and that it was put on board, not by an officer of the bank, but by Harnden, a forwarding agent for the community generally, and under a special contract between Harnden and the respondents, that the

latter were not to run any risk, nor be responsible for any losses of property thus shipped by him.

But some other facts are not so certain. One of that character is, whether the fire occurred by accident, without any neglect whatever by the respondents and their agents, or in consequence of some gross neglect by one or both. It would not be very material to decide this last fact, controverted as it is and in some degree doubtful, if I felt satisfied that the plaintiffs could recover anywhere, and more especially in admiralty, on the contract made by Harnden with the respondents, for the breach of the contract to carry and deliver this property.

The first objection to such a recovery on the contract anywhere is, that it was made with Harnden, and not with the bank. Butler v. Basing, 2 Car. & Payne, 613 ; 15 Mass. 370 ; 2 Story, 32. Next, that he was acting for himself, in this contract, on his own duties, liabilities, and undertakings, and not for them ; and that the bank, so far as regards any contract, looked to him and his engagement with them, and not to the respondents or their engagement with him. 6 Bingh. 131. Next, that the articles, while on board the boat, were to be in the care and control of Harnden, and not of the master or owners ; and hence no liability exists on the contract even to him, much less the bank. Story on Bailments, p. 547, § 582. And this same conclusion is also urged, because Harnden, by his contract, made an express stipulation, that the property carried should be at his risk, as well as in his care. See. 5 East, 428 ; 1 Ventris, 190, 288. It is contended further, that, if the bank can sue on Harnden's contract made with the respondents, it must be on the principle of his acting in it as their agent, and not for himself alone ; and if so, and they, by suing on it, adopt its provisions, they must be bound by the stipulation in it made by him, not to hold the respondents liable for any risk or loss.

It is, however, doubted, whether, with such a stipulation, the respondents are not, by public policy, to be still liable on a contract like this, in order to insure greater vigilance over all things intrusted to their care (Gould v. Hill, 2 Hill, 623), and on the ground, that the parties could not mean by the contract that the carriers were to be exonerated for actual misbehaviour, but only for accidents otherwise chargeable on them as *quasi* insurers. Atwood v. Reliance Insurance Company, 9 Watts, 87 ; 2 Story, 32, 33.

It is insisted, next, that, as the unusual nature of the property carried, in this case, was not made known to the carriers, nor a proportionate price paid for its transportation, the owner

cannot recover beyond the usual value of common merchandise of such a bulk. Citizens' Bank *v.* Steamboat Nantucket, 2 Story, 32 ; 25 Wend. 459 ; Gibbon *v.* Paynton, 4 Burr. 2301.

But, giving no decisive opinion on the validity of any of these objections, as not necessary in the view hereafter taken, yet they are enumerated to show some of the difficulties in sustaining a recovery on this contract, notwithstanding their existence.

Another important objection remains to be considered. It is, that no jurisdiction exists over this contract in a court of admiralty where these proceedings originated. The contract was made on land, and of course within the body of the county of New York. It was also not a contract for a freight of goods abroad, or to a foreign country, the breach of which has been here sometimes prosecuted in courts of admiralty. Drinkwater et al. *v.* The Spartan, Ware, D. C. 149, by a proceeding *in rem* (155) ; De Lovio *v.* Boit, 2 Gall. 398 ; The Volunteer, 1 Sumner, 551 ; Logs of Mahogany, 2 Sumner, 589 ; 6 Dane's Abr. 2, 1, *Charter-parties.* See a case *contra,* in the records of Rhode Island, A. D. 1742.

But the law of England is understood to be, even in foreign charter-parties, against sustaining such suits, *ex contractu,* in admiralty. 3 D. & E. 323 ; 2 Lord Raym. 904 ; 1 Hag. Ad. 226, and cases cited in 12 Wheaton, 622, 623.

By agreement of the judges in A. D. 1632, admiralty was not to try such cases, if the charter-party was contested. Dunlap's Adm. 14 ; 4 Instit. 135 ; Hobart, 268.

It seems, however, to be doubted by Browne (2 Browne's Civ. and Adm. Law, 122, 535), whether the libellant may not proceed in admiralty, if he goes to recover freight only, and not a penalty. It is also believed, that, in this country, contracts to carry freight between different States, or within the same State, if it be on tide-water, or at least on the high seas, have sometimes been made the subject-matter of libels in admiralty. Dunlap's Adm. 487 ; 1 Sumner, 551 ; 3 Am. Jur. 26 ; 6 Am. Jur. 4 ; King et al. *v.* Shepherd, 3 Story, 349, in point ; Gilp. D. C. 524 ; Conkling, Pra. 150 ; De Lovio *v.* Boit, 2 Gall. 448. I am inclined to the opinion, too, that, at the time the Constitution of the United States was adopted, and the words " cases of admiralty and maritime " were introduced into it, and jurisdiction over them was subsequently given in civil proceedings, in the act of 1789, to the District Courts, the law in England had in some degree become changed in its general principles in respect to jurisdiction in admiralty over contracts. Their courts had become inclined to hold, that the place of performance of a contract, if maritime in its subject, rather

than the place of its execution, was the true test as to its construction and the right under it. This conformed, also, to the analogy as to contracts at common law. See cases in Towne v. Smith, 1 Woodbury & Minot, 135.

It is not unusual for the place to which the parties look for fulfilling their duties to be not only different from the place of making the contract, but for the parties to regard other laws and other courts, applying to the place of performance, as controlling and as having jurisdiction over it. Bank of the United States v. Donnally, 8 Peters, 361; Wilcox v. Hunt, 13 Peters, 378; Bell et al. v. Bruen, 1 Howard, 169.

Hence, for a century before 1789, Lord Kenyon says, admiralty courts had sustained jurisdiction on bottomry bonds, though executed upon the land; because, "if the admiralty has jurisdiction over the subject-matter, to say that it is necessary for the parties to go upon the sea to execute the instrument borders on absurdity." See Menetone v. Gibbons, 3 D. & E. 267–269; 2 Lord Raym. 982; 2 H. Bl. 164; 4 Cranch, 328; Paine's C. C. 671. On this principle, the admiralty has gradually been assuming jurisdiction over claims for pilotage on the sea, both the place of performance and the subject-matter being there usually maritime. 10 Wheat. 428; 7 Peters, 324; 10 Peters, 108; 11 Peters, 175; 1 Mason, C. C. 508. Because, on the general principle just referred to, as to the object of the contract, if "it concerned the navigation of the sea," and hence was in its nature and character a maritime contract, it was deemed within admiralty jurisdiction, though made on land. Zane v. The Brig President, 4 Wash. C. C. 454; 4 Mason, C. C. 380; The Jerusalem, 2 Gall. 191, 465, 448; The Sloop Mary, Paine, C. C. 671; Gilp. D. C. 184, 477, 429; 2 Sumner, 1.

This is the principle, at the bottom, for recovering seamen's wages in admiralty. Howe v. Nappier, 4 Burr. 1944.

Not that the consideration merely was maritime, but that the contract must be to do something maritime as to place or subject. Plummer v. Webb, 4 Mason, C. C. 380; Berni v. The Janus et al., 1 Baldw. C. C. 549, 552 "A New Brig," Gilp. D. C. 306. But we have already seen there are several direct precedents in England against sustaining these proceedings in admiralty on the contract, such as a charter-party or bill of lading, and strong doubts from some high authorities against it in this country. Chancellor Kent seems to think a proceeding in admiralty, on a charter-party like this, cannot be sustained, except by what he calls "the unsettled doctrine laid down in De Lovio v. Boit." 3 Kent, Comm. 162. See like-

wise Justice Johnson's opinion to the like effect in Ramsey
v. Allegre, 12 Wheat. 622.

Looking, then, to the law as held in England in 1789, and
not considering it to be entirely clear in favor of sustaining a
suit in admiralty on a charter-party like this, and that it is very
doubtful whether any more settled or enlarged rule on this sub-
ject then prevailed in admiralty here, or has since been deliber-
ately and generally adopted here, in respect to charter-parties
or bills of lading, I do not feel satisfied in overruling the ob-
jection to our jurisdiction which has been made on this ground.

The further arguments and researches since Waring v. Clarke
(5 How.) tend also, in my view, to repel still more strongly any
idea that admiralty jurisdiction had become extended here, at
the Revolution, in cases either of contracts or torts, more
broadly than in England.

But it is not necessary now to go into the new illustrations
of this cited in the elaborate remarks of the counsel for the
respondents, or discovered by myself, in addition to those
quoted in the opinion of the minority in Waring et al. v.
Clarke, and in The United States v. The New Bedford Bridge,
1 Woodbury & Minot. Among mine is the declaration by
Lord Mansfield himself, December 20th, 1775, that the colo-
nies wished "that the admiralty courts should never be made
to extend there," instead of wishing their powers enlarged
(6 American Archives, 234; Annual Register for 1776, pp. 99,
100); and there is likewise the protest of the friends of Amer-
ica, the same year, in the House of Lords, that the increase
of admiralty power by some special acts of Parliament was a
measure favored at home rather than here, and was not ac-
ceptable here, but denounced by them as an inroad on the
highly prized trial by jury. 6 American Archives, 226. Among
those cited is the conclusive evidence, that in some of the
colonies here before the Revolution, the restraining statutes
of Richard II., as to the admiralty, were *eo nomino* and ex-
pressly adopted, instead of not being in force here. See in
South Carolina, 2 Statutes at Large, 446, in 1712, and in Mas-
sachusetts, Dana's Defence of New England Charters, 49 – 54;
in Virginia, "the English Statutes" passed before James I.,
9 Hening's Statutes, 131, 203; Commonwealth v. Gaines,
2 Virg. Cases, 179, 185; in Maryland, 1 Maryland Statutes,
Kilty's Report, 223; and in Rhode Island, her records of a case
in 1763, at Providence.

But I pass by all these, and much more, because, notwith-
standing the course of practice here the last half-century in some
districts, and the inattention and indifference exhibited in many
others as to the true line of discrimination between the juris-

diction belonging to the common law courts and that in admiralty, enough appears to induce me, as at present advised, not to rest jurisdiction in admiralty over a transaction like this on contract alone. I shall not do it, the more especially when a ground less doubtful in my apprehension exists and can be relied on for recovering all the loss, if the damage was caused by a tort.

I have turned my attention to ascertain whether the facts in this case exhibit any wrong committed by the respondents, of such a character as a tort, and in such a locality as may render our jurisdiction in admiralty clear over it, looking to the principles of admiralty law in England, and also in this country, so far as can now be discovered to have existed at the time of our Revolution.

First, as to this, it is argued, that, in point of fact, gross negligence existed in the transportation of this property. If so, this conduct by the respondents or their agents may be sufficient to justify, a proceeding *ex delicto* for the nonfeasance or misfeasance constituting that neglect, and causing the loss of this property, entirely independent of the contract or its form, or the risks under it, or the want of notice of the great value of the property. Particularly might this be sufficient, if the injury was caused in a place, and under circumstances, to give a court of admiralty undoubted jurisdiction over it as a marine tort.

The question of fact, then, as to neglect here, and the extent of it, may properly be investigated next, as in one view of the subject it may become highly important and decisive of the right to recover, and as it is our duty to settle facts in an admiralty proceeding; when they are material to the merits.

As before intimated, it is here virtually conceded, that the property of the plaintiffs, while in charge of the respondents as common carriers on the sea, was entirely lost, by the burning of the boat in which it was transported.

The first inference from these naked facts would be, that the fire was produced by some cause for which the owners were responsible, being generally negligence, and that *primâ facie* they were chargeable. 6 Martin, 681; Story on Bailments, §§ 533, 538.

Indeed, the common carrier who receives property to transport, and does not deliver it, is always held *primâ facie* liable. Abbott on Ship., ch. 3, § 3; 1 Ventris, 190; 6 Johns. 169; 8 Johns. 213; 19 Wendell, 245; Story on Bailments, § 533; 3 Kent, Comm. 207, 216; 3 Story, 349, 356; 5 Bingh. 217, 220; 4 Bingh. 218.

If they would have this inference or presumption changed, so as to exonerate themselves, it must be done by themselves,

and not the plaintiffs, and by proof removing strong doubts; or, in other words, turning the scales of evidence in their favor in this attempt. This idea is fortified by the express provision establishing a presumption, by the act of Congress, in case of damages by explosions of steam. 5 Stat. at Large, p. 305, § 13.

Independent of this presumption, when we proceed to examine the evidence on both sides as to the contested points of fact connected with the loss, it is found to be decidedly against the conduct of the respondents and their agents; and, so far from weakening the presumption against them from the actual loss, it tends with much strength to confirm it. There had, to be sure, been recent repairs, and certificates not long before obtained of the good condition of the boat. But on the proof, she does not seem to have been in a proper state to guard against accidents by fire when this loss occurred. Her machinery was designed at first to burn wood, and had not long before been changed to consume anthracite coal, which created a higher heat. And yet there was a neglect fully to secure the wooden portions of the boat, near and exposed to this higher heat, from the natural and dangerous consequences of it. So was there an omission to use fire-brick and new sheet-iron for guards, nigh the furnace. On one or two occasions, shortly before this accident, the pipe had become reddened by the intense heat so as to attract particular attention; and shortly before, the boat actually caught fire, it is probable, from some of those causes, and yet no new precautions had been adopted.

In the next place, the act of Congress (5 Stat. at Large, pp. 304, 305) requires the owners of steamboats "to provide, as a part of the necessary furniture, a suction-hose and fire-engine and hose suitable to be worked in said boat, in case of fire, and carry the same upon each and every voyage in good order." (Sec. 9.) And it imposes also a penalty of $ 500 for not complying with any condition imposed by the act. (Sec. 2.)

The spirit of this requisition is as much violated by not having the hose and engine so situated as to be used promptly and efficiently, as by not having them at all, or not having them "in good order."

The hose and engine were not kept together, and hence could not be used on that fatal night. One was stowed away in one part of the boat, and the other elsewhere, so as not to be in a situation to be brought promptly into beneficial use.

Again, it was an imperative provision in the act of Congress before referred to (sec. 9), — and the neglect of it was punished by a fine of $ 300, on the owner as well as master, — " that iron rods or chains shall be employed and used in the navigating of all steamboats, instead of wheel or tiller ropes."

Yet this was not complied with, and renders their conduct in this respect, not only negligent, but illegal.

Though, in fact, this accident may not have proved more fatal than otherwise from this neglect, the non-compliance with the provision was culpable, and throws the burden of proof on the owners to show it did not contribute to the loss. Waring et al. *v.* Clarke, 5 Howard, 463. It is true, that Congress, some years after, March 30, 1845, dispensed with a part of this provision (5 Stat. at Large, 626), under certain other guards. Yet in this case even those other guards were wholly omitted.

Nor does there appear to have been any drilling of the crew previously, how to use the engine in an emergency, or any discipline adopted, to operate as a watch to prevent fires from occurring, or, after breaking out, to extinguish them quickly. Indeed, the captain, on this occasion, checked the efforts of some to throw the ignited cotton overboard, so as to stop the flames from spreading, by peremptorily forbidding it to be done.

The respondents, to be sure, prove that several buckets were on board. But the buckets, except in a single instance, were not rigged with heaving-lines, so as to be able to draw up water, and help to check promptly any fire which might break out. And in consequence of their fewness or bad location, some of the very boxes containing the specie of the plaintiffs were broken open and emptied, in order to hold water. Lastly, when discovered, the officers and crew do not appear generally to have made either prompt or active exertions to extinguish the fire, or to turn the vessel nearer shore, where this property, and the passengers, would be much more likely to be preserved, eventually, than by remaining out in the deep parts of the Sound.

The extent and nature of the liability thus caused are well settled at law. The property of the plaintiffs was destroyed by fire, through great neglect by the defendants and their agents. Common carriers are liable for losses by fire, though guilty of no neglect, unless it happen by lightning. 1 D. & E. 27; 4 D. & E. 581; 3 Kent, Comm. 217; 5 D. & E. 389; Gilmore *v.* Carman, 1 Smedes & Marsh. 279; King et al. *v.* Shepherd, 3 Story, Rep. 360; 2 Browne, Civ. and Adm. Law, 144; 2 Wend. 327; 21 Wend. 190. These respondents were common carriers, in the strictest and most proper sense of the law. King et al. *v.* Shepherd, 3 Story, Rep. 349. See other cases, *post.*

They would, therefore, be liable in the present case without such neglect, if this view of it applied to a recovery on the ground of a tort as well as of a contract. But as it may not,

36 *

the next inquiry is if the facts disclose a breach of duty, a culpable neglect, either by the officers or owners of the vessel, amounting to a tort, and for which the defendants are responsible.

It is well settled, that a captain is bound to exercise a careful supervision over fires and lights in his vessel, ordinarily. Malynes, 155; The Patapsco Ins. Co. v. Coulter, 3 Peters, 237, 228, 229; Busk v. The Royal Ex. Ass. Co., 2 Barn. & Ald. 82.

He is required in all things to employ due diligence and skill (9 Wend. 1; Rice's R. 162), to act "with most exact diligence" (1 Esp. Ca. 127), or with the *utmost care* (Story on Bailm. § 327). But how much more so in a steamboat, with fires so increased in number and strength, and especially when freighted with very combustible materials, like this, chiefly with cotton!

His failure to exert himself properly to extinguish any fire amounts to barratry. 3 Peters, 228, 234; Waters v. Merch. Louisville Ins. Co., 11 Peters, 213; 10 Peters, 507. And if the property be insured against barratry, the owners may then recover.

To be sure, in one case the owners of a steamboat were exonerated from paying for a loss by fire. But it was only under the special provision of the local laws, rendering them exempt, if the fire occured "by accidental or uncontrollable events." See Civil Code of Louisiana, 63d article; Hunt v. Morris, 6 Martin, 681.

So the written contract for freight, as well as that for insurance, sometimes does not cover fire, but specially exempts a loss by it. 3 Kent, Comm. 201 – 207.

In such case there may be no liability for it on the insurance, and doubtfully on the charter or bill of lading, unless it was caused by gross neglect, *crassa negligentia.* But in case of such neglect, liability exists even there. 3 Kent, Comm. 217; 3 Peters, 238; 1 Taunton, 227. In this view the owners seem liable for all damages which they or their servants could have prevented by care. 8 Serg. & Rawle, 533. As an illustration of what are meant by such damages, they are those which happen, if on land, from unskilful drivers, "from vicious and unmanageable horses, or when occasioned by overloading the coaches, as these would imply negligence or want of care." Beckman v. Shouse, 5 Rawle, 183.

From the above circumstance, the conclusion is almost irresistible, that what constitutes a gross neglect by the respondents and their agents, as to the condition of the boat and its equipments, existed here, and by the deficiencies and imperfec-

tion of them contributed much to the loss of this property; and beside this, that want of diligence and skill on board, after the fire broke out, as well as want of watchfulness and care to prevent its happening or making much progress, was manifest.

If any collateral circumstance can warrant the exaction of greater vigilance than usual, on occasions like these, or render neglects more culpable, it was, that the lives of so many passengers were here exposed by them, and became their victims. This last consideration is imperative, in cases of vessels devoted both to freight and passengers, to hold the owners and their servants responsible for the exercise of every kind of diligence, watchfulness, and skill which the principles of law may warrant. Beside the great amount of property on board on this occasion, they had in charge from one to two hundred passengers, including helpless children and females, confiding for safety entirely to their care and fidelity. All of these, except two or three, were launched into eternity, during that frightful night, by deaths the most painful and heart-rending. Had proper attention been devoted to the guards against fire, such as prudence and duty demanded, or due vigilance and energy been exercised to extinguish it early, not only would large amounts of property probably have been saved, but the tragic sufferings and loss of so many human beings averted.

In view of all this, to relax the legal obligations and duties of those who are amply paid for them, or to encourage careless breaches of trusts the most sacred, or to favor technical niceties likely to exonerate the authors of such a calamity, would be of most evil example over our whole seaboard, and hundreds of navigable rivers and vast lakes, where the safety of such immense property and life depends chiefly on the due attention of the owners and agents of steamboats, and is, unfortunately, so often sacrificed by the want of it. To relax, also, when Congress has made such neglect, when followed by death, a crime, and punishable at least as manslaughter, would be unfaithfulness to the whole spirit of their legislation, and to the loudest demands of public policy.

Their enactment on this subject is in these words (see statute before cited, sec. 12): — " That every captain," &c., " by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person on board said vessel may be destroyed, shall be deemed guilty of manslaughter," &c.

Showing, then, as the facts seem to do here, wrongs and gross neglect by both the owners and officers of the boat, the next step in our inquiries is, whether any principles or precedents exist against their being prosecuted in admiralty as a

tort, and by a proceeding which sounds *ex delicto,* and entirely independent of any contract.

The recovery, in cases like this, on the tort, counting on the duty of the carrier and its breach by the negligent loss of the property, is common, both in this country and abroad, in the courts of common law.

Whether it be redressed there in trespass or case, when suing *ex delicto,* is immaterial, if, when case is brought, the facts, as here, show neglect or consequential damage, rather than those which are direct and with force. And if case lies at common law on such a state of facts, there seems to be no reason why a libel in admiralty may not lie for the wrong, whenever, as here, it was committed on the sea, and clearly within admiralty jurisdiction over torts. For the admiralty is governed by like principles and facts, as to what constitutes a tort, as prevail in an action at law for damages, and its ingredients are the same, whether happening on land or water. But case will lie at law, on facts like those here, for reasons obvious and important in the present inquiry. Indeed, on such facts the ancient action was generally in case, and counted on the duty of the carrier to transport safely the property received, and charged him with tortious negligence in not doing it. 1 Price, 27 ; 2 Kent, Comm. 599 ; 3 Wend. 158. In such proceedings at common law, the difference was in some respects, when *ex delicto,* more favorable to the owners, as then some neglect, or violence, or fraud, or guilt of some kind, must be shown, amounting to a breach of public duty by the carrier or his servants. Hinter *v.* Dibdin et al., 2 Adol. & Ell., N. S. 646 ; 2 New R. 454 ; 2 Chit. R. 4. While in the action of assumpsit, more modern, but by no means exclusive, the promise or contract alone need be shown, and a breach of that, though without any direct proof of neglect, as carriers are, by their duties, in law, insurers against all losses except by the king's enemies and the act of God. 3 Brod. & Bingh. 62, 63 ; 19 Wend. 239 ; Forward *v.* Pittard, 1 D. & E. 27 ; 1 Esp. Ca. 36 ; 2 Chit. R. 1 ; Ashmole *v.* Wainwright, 2 Adol. & Ell., N. S. 663.

So it is well settled that these rules of law, and all others as to common carriers by land, apply to those by water, and to those boats carrying freight, as this one did. 10 Johns. 1 ; 1 Wils. 281 ; 3 Esp. Ca. 127 ; 2 Wend. 327 ; 3 Story, 349.

What, then, in principle, operates against a recovery?

Some would seem to argue, that a proceeding *ex delicto* must be trespass, and that case is not one. But when it proceeds, as here, for consequential damages, and those caused by gross neglect, and not a mere breach of contract, it sounds *ex delicto* as much as trespass itself. 1 Chit. Pl. 142 ; 3 East, 593 ; 2 Saund. 47, *b.*

The misconduct complained of here amounted to a tort, as much as if it had been committed with force. A tort means only a wrong, independent of or as contradistinguished from a mere breach of a contract. The evidence here, in my apprehension, shows both misfeasance and nonfeasance, and a consequential loss from them, which it is customary to consider as tortious. It was here, to be sure, not a trespass *vi et. armis,* and perhaps not a conversion of the property so as to justify trover, though all the grounds for the last exist in substance, as the plaintiffs have lost their property by means of the conduct of the defendants, into whose possession it came, and who have not restored it on demand, nor shown any good justification for not doing it.

It is altogether a mistake, as some seem to argue, that force and a direct injury are necessary to sustain proceedings in tort, either at law or in admiralty, for damages by common carriers. So little does the law regard, in some cases, the distinction between nonfeasance and misfeasance, in creating a tort and giving any peculiar form of action for it, that in some instances a nonfeasance is considered as becoming misfeasance ; such as a master of a vessel leaving his register behind, or his compass, or anchor. 3 Peters, 235. And "torts of this nature," as in the present case, may be committed either by "nonfeasance, misfeasance, or malfeasance," and often without force. 4 D. & E. 484; 1 Chit. Pl. 151; Bouvier's Dict., *Tort.* And even where *mala fides* is necessary to sustain the proceeding, gross negligence is evidence of it. 4 Adol. & Ell. 876; 1 Howard, 71; 1 Spence's Eq. Jur. 425; Jones on Bailments, 8; Story on Bailments, §§ 19, 20. The action in such case is described as "upon tort," and arises *ex delicto.* 2 Kent, Comm. 599. In most instances of gross negligence, misfeasance is involved (2 Cromp. & M. 360) ; as a delivery to a wrong person, or carrying to a wrong place, or carrying in a wrong mode, or leaving a carriage unwatched or unguarded. 2 Cromp. & M. 360; 8 Taunt. 144. Where case was brought for damage by overloading and sinking a boat, it was called an action "for a tort," and sustained, though the injury was wholly consequential. 1 Wils. 281.

Again, it has been argued, that if direct force be not a necessary ingredient to recover in this form of action, it must in some degree rest on the contract which existed here with Harnden, and be restrained by its limitations. But the books are full of actions on the case where contracts existed, which were brought and which count entirely independent of any contract, they being founded on some public duty neglected, to the injury of another, or on some private wrong or

misfeasance, without reference to any promise or agreement broken. 12 East, 89; 4 Howard, 146; Chit. Pl. 156; Forward *v.* Pittard, 1 D. & E. 27; 2 N. Hamp. 291; 2 Kent, Comm. 599.; 3 East, 62; 6 Barn. & Cres. 268; 5 Burr. 2825; 6 Moore, 141; 9 Price, 408; 5 Barn. & Cres. 605 – 609. Some of the cases cited of this character are precisely like this, being for losses by non-delivery of property by common carriers, and sued ·for as torts thus committed. 5 D. & E. 389. They go without and beyond the contract entirely.

Nor is intent to do damage a necessary ingredient to sustain either case or trespass. 2 New R. 448. Though the wrong ' done is not committed by force or design, it is still treated as *ex delicto* and a tort, if it was done either by a clear neglect of duty, by an omission to provide safe and well-furnished carriages or vessels, by carelessness in guarding against fires and other accidents, by omitting preparations and precautions enjoined expressly by law, or by damages consequent on the negligent upsetting of carriages, or unsafe and unskilful navigation of vessels. See cases of negligent defects in carriages and vessels themselves, 2 Kent, Comm. 597, 607; 6 Jurist, 4; The Rebecca, Ware, D. C. 188; 10 East, 555; 1 Johns. Cas. 134; 5 East, 428. Or in machinery, Camden and Amboy Railroad *v.* Burke, 13 Wend. 611, 627; 5 East, 428; 9 Bingh. 457. Even if the defect be latent, 3 Kent, Comm. 205. See those of careless attention, The Rebecca, Ware, D. C. 188. See those of non-conformity to legal requisitions, as hose and engine here not in good order, Waring et al. *v.* Clarke, 5 Howard. See those consequent on negligent driving, 4 Barn. & Cres. 223; Bretherton *v.* Wood, 3 Brod. & Bingh. 54. If damage or loss happen by neglect or wrong of a servant of a common carrier, the principal is still liable. 13 Wend. 621; Story on Partnership, § 489; Dean et al. *v.* John Angus, Bee's Adm. 369, 239; Story on Bailments, § 464; 2 Browne, Civ. and Adm. Law, 136. This is necessary to prevent fraud; if such neglect be not evidence of fraud or misfeasance. The owner should be liable for employing those negligent. Story on Agency, § 318 and note.

There is another important consideration connected with this view of the subject, and relieving it entirely from several objections which exist to a proceeding founded wholly on a contract rather than a tort. It is this. Where the injury is caused by a tort or fraud, no question arises as to any special agreement or notice, as with Harnden here, not to assume any risk. In short, the agreement, of that kind here, does not exonerate, if "malfeasance, misfeasance, or gross negligence" happens by owners or their servants. 13 Wend. 611; 19 Wend. 234, 251, 261; 5 Rawle, 179, 189; 2 Crompt. & M.

353; 2 Kent, Comm. § 40; Brooke *v.* Pickwick, 4 Bingh. 218; 3 Brod. & Bingh. 183. Because the wrong is then a distinct cause of action from the breach of the contract, and the exception in it as to the risk was intended to reach any loss not happening through tortious wrong. "Even with notice, stage-proprietors and carriers of goods would be liable for an injury or loss arising from the insufficiency of coaches, harness, or tackling, from the drunkenness, ignorance, or carelessness of drivers, from vicious and unmanageable horses, or when occasioned by overloading the coaches, as these would imply negligence or want of care." 3 Rawle, 184. It is further settled, in this class of cases, that the principle of not being liable for jewels, money, and other articles of great value, unless notice was given of it and larger freight paid in consequence of it, does not apply. 4 Bingh. 218; 5 Bingh. 223; 2 Crompt. & M. 353. Because here the liability is not that of an insurer against many accidents and many injuries by third persons of the property carried, and which it may be right to limit to such values as were known and acted upon in agreeing to carry. But it is for the wrong of the carrier himself, or his agents; their own misfeasance or nonfeasance, and hence gross neglect, renders them responsible for the whole consequential damages, however valuable the property thus injured or lost. 2 Barn. & Ald. 356; 8 Taunt. 174; 4 Binn. 31; 2 Adol. & Ell. 659; 5 Barn. & Ald. 341, 350; 16 East, 244, 245.

Some think the neglect in such case, so as to be liable for valuables, must amount to misfeasance. 2 Adol. & Ell. 659; 2 Myl. & Craig, 358. It must be "misfeasance or gross negligence." 2 Kent, Comm. 607, note; 13 Price, 329; 12 B. Moore, 447; 5 Bingh. 223–225; 8 Mees. & Wels. 443. By a recent statute in England, under William IV., though the carrier has been exonerated from the liability and care of valuables, without notice, yet he cannot be if gross neglect happens. 2 Adol. & Ell. 646.

All this being established at law, what is there to prevent this wrong from being deemed a tort, in connection with maritime matters, — or, in other words, "a marine tort," — and subject to be prosecuted in admiralty? I am not aware that a marine tort differs from any other tort in its nature or incidents, except that it must be committed, as this was, on the high seas. See cases cited in Waring et al. *v.* Clarke, 5 Howard. There it was held sufficient to constitute a marine tort, and one actionable in admiralty, if the wrong was committed only on tide-water.

We have already suggested, also, as to the gist of the wrong, that gross neglect, the elements and definition of it, are the same on the water as on land, and consequential or direct dam-

ages by a wrong are regarded in the same light on both. The actions of case, as well as trespass, at common law, in illustration of this, are numerous, as to torts on the water. (See *ante.*)

Force, too, is no more necessary to constitute this kind of tort at sea than on land, or in admiralty than in a common law court. 3 Story, 349. That is the gist of this branch of the case. It is true, that most of the libels in admiralty for torts are for such as were caused by force, like assaults and batteries (4 Rob. Adm. 75); or for collision between ships on the sea, to the injury of person or property (2 Browne's Civ. and Adm. Law, 110; Dunlap's Adm. 31; Moore, 89); or for wrongful captures (10 Wheat. 486; Bee's Adm. 369; 1 Gall. 315; 3 Cranch, 408); or for carrying off a person *in invitum* (Dunlap's Adm. 53); or for any "violent dispossession of property on the ocean" (1 Wheat. 257; L'Invincible, 1 Wheat. 238; 3 Dall. 344). And though, where trespass is brought at common law, or a tort is sued for in admiralty as "a marine trespass," there must usually have been force and an immediate injury (1 Chit. Pl. 128; 11 Mass. 137; 17 Mass. 246; 1 Pick. 66; 8 Wend. 274; 3 East, 293; 11 Wheat. 36, *argu.* ; 4 Rob. Adm. 75), yet it need not be implied or proved in trespass on the case at law, or in a libel in admiralty for consequential damages to property. Such a libel lies as well for a tort to property as to the person, on the sea (2 Browne's Civ. and Adm. Law, 109, 202; Doug. 594, 613, note; 4 Rob. Adm. 73 – 76; Martin *v.* Ballard et al., Bee's Adm. 50, 239); and for consequential injury by a tort there, as well as direct injury. Sloop Cardolero, Bee's Adm. 51, 60; 3 Mason, 242; 4 Mason 385 – 388; 2 Browne's Adm. 108; 2 Story, 188; 2 Sir Leoline Jenkins, 777. It was even doubted once, whether, for such torts at sea, any remedy existed elsewhere than in admiralty. 2 Browne's Civ. and Adm. Law, 112. Indeed, 1 Browne's Civ. and Adm. Law, 397, shows, that, beside rights arising from contract, there were "obligations or rights arising to the injured party from the torts or wrongs done by another." And these were divided into those arising *ex delicto* and those *quasi ex delicto* ; and the former included " damage" to property, as in this case. It meant injury to property by destroying, spoiling, or deteriorating it, and implied " faultiness or injustice" (401), but not necessarily force. Either trespass or case sometimes lies for a marine tort, even in the collision of vessels, where at times the only force is that of winds and tides, and the efforts of the master were to avoid, rather than commit, an injury. 1 Chit. Pl. 145; 2 Story, 188; 11 Price, 608.; 3 Car. & Payne, 554. Damages by insufficient equipments, ropes, &c., must be paid by the owners of the vessel to the merchant,

even by the Laws of Oleron (art. 10). Sea Laws, 136; Laws of Wisby, art. 49. And nothing is more consequential, or less with force, than that kind of injury.

Finally, the principles applicable to the definition of the wrong or tort being here in favor of a recovery in admiralty, and there being no precedents in opposition, but some in support of it, the inference is strong, that this destruction of the property of the plaintiffs may well be regarded and prosecuted in admiralty as a marine tort.

Though I admit there are no more cases in point abroad, in 1789, for sustaining a suit for a consequential injury by a carrier as a tort, than on the contract, in admiralty, yet the principles are most strongly in favor of relying on the tort, without any opposing decision, as there is to a libel on the contract. Beside this, other difficulties are avoided, and more ample justice attained, by the libel here for the tort, than by one for the contract.

A moment to another objection, — that the libel in this case does not contain allegations in proper form to recover damages in admiralty, as if for a maritime tort.

This libel is in several separate articles, rather than in a single count. In none of them is any contract specifically set out, though in one of them something is referred to as "contracted." The libel avers, that the respondents were common carriers; that a public duty thus devolved on them; that they received the property on board to transport it, and so negligently conducted, it was lost. The breach is described throughout, not of what had been "contracted" or promised, but as a wrong done, or tort, and specifies several misdoings. It is in these words : —

"Yet the respondents, their officers, servants, and agents, so carelessly and improperly stowed the said gold coin and silver coin, and the engine, furnace, machinery, furniture, rigging, and equipments of the said steamboat were so imperfect and insufficient, and the said respondents, their officers, servants, and agents, so carelessly, improperly, and negligently managed and conducted the said steamboat Lexington, during her said voyage, that by reason of such improper stowage, imperfect and insufficient engine, furnace, machinery, furniture, rigging, and equipments, and of such careless, improper, and negligent conduct, the said steamboat, together with the gold coin and silver coin to the libellants belonging, were destroyed by fire on the high seas, and wholly lost."

Where contract and tort, in the forms of declaration at common law in actions of the case, are with difficulty discriminated, the general test adopted is, if specific breaches are as-

signed, sounding *ex delicto*, it is case on the tort. Jeremy on Carriers, 117. Here this is done.

The same technical minuteness is not necessary in a libel as in a declaration at common law. 5 Rob. Adm. 322 ; Dunlap, Adm. 438, 439 ; Ware, D. C. 51. Only the essential facts need be alleged, without regard to particular forms, either in contract or tort. Hall's Prac. 207, 138 ; Dunlap, Adm. 427.

And in the same libel between the same parties, unlike the rule at common law, it is held by some that both contract and tort may be joined, though it is proper to state them in separate articles in the libel, like separate counts. *Semble* in 3 Story, R. 349 ; Dunlap, Adm. 89. And in some cases it is clearly better not to unite them. Ware, D. C. 427. Here, if the libel is considered as but separate paragraphs of one article, it is a good one in tort. Dunlap, Adm. 114, 115 ; 4 Mason, C. C. 541. And if as separate articles, one of them is valid in tort.

The forms of libels for maritime torts include those which caused only consequential damages, as well as those which caused direct damages. Dunlap, Adm. 49 ; 3 Story, R. 349, one count seems to be for the wrong.

There are cases of this kind merely for improper usage to passengers, by bad words, and neglect ; but no force existed, or was alleged. 3 Mason, C. C. 242.

Others are libels for seducing or carrying away a minor son of the plaintiff to his damage, like the actions on the case at common law. Plummer *v.* Webb, 4 Mason, C. C. 380. Yet they are called, as they are in law, " tortious abductions."

So a libel lies for loss of goods " carelessly and improperly stowed." Ware, D. C. 189.

But if the libel here was less formal in tort, the liberality practised in admiralty pleadings, regarding the substance chiefly, as in the civil law, would allow here any necessary amendments. Dunlap, Adm. 283 ; 4 Mason, C. C. 543 ; 3 Wash. C. C. 484. Or would allow them in the court below, by reversing the judgment, and sending the case back with directions to permit them there. 4 Wheat. 64, 63 ; 4 Howard, 154 ; 1 Wheat. 264, 13 ; 9 Peters, 483.

The amount of damages which can be awarded in admiralty, in a case like this, has been agitated by some of the court, but was not argued at the bar. It is not without difficulty, but can in a minute or two be set right. By the ancient practice in admiralty, in case of contracts of freight made by the master, it is true that the owners were liable, whether *ex contractu* or *ex delicto*, and whether *in personam* or *in rem*, for only the value of the vessel or the capital used in that busi-

ness.  Dunlap, Adm. 31.  And if the vessel was lost, the remedy against the owners was entirely lost in admiralty. Ware, D. C. 188.  Yet it is a conclusive answer, that here, as well as abroad, the rule of the civil and common law is to give the whole loss.  2 Kent, Comm. 606; 3 Kent, Comm. 217. And that this rule of full damage in a libel in admiralty has been adopted here after much consideration.  Livingston, Justice, in Paine, C. C. 118, says, that "it had long been regarded as a general principle of maritime law" to make the owners liable for a tort by the master, and that now the whole injury was the measure of damage, without reference to the value of the vessel and freight.  See also Del Col *v.* Arnold, 3 Dall. 333; The Appollon, 9 Wheat. 376; 3 Story, R. 347; 2 Story, R. 187.

This is modified by some State laws, under certain circumstances.  See The Rebecca and Phebe, Ware, D. C.  And England, by 53 Geo. III. ch. 99.

But even there the owner is still liable beyond the value of the vessel and freight, if the damage or neglect was "committed or occasioned" with "the fault or privity of such owner."  See Statutes at Large of that year; Phebe, Ware, D. C. 269.  See for this and other statutes, 2 Bro. Civ. and Adm. Law, 45, excusing owners if the pilot alone is in fault.  See 6 Geo. IV. ch. 125, § 55; 1 Wm. Rob. 46; 1 Dod. Adm. 467.  So the whole injury must be paid now on the contract, and the owners cannot escape by abandoning the vessel which did the wrong.  2 Bro. Civ. and Adm. Law, 206, note.

On principle, also, this is the right rule in admiralty, clearly, where the owners themselves at home, and not the master abroad, made the contract, or where they were guilty of any neglect in properly furnishing the vessel, and not he.  Phebe, Ware, D. C. 269, 203 – 206.

The principle of his binding them only to the extent of the property confided to him to act with, or administer on, does not apply to that state of facts (Abbott on Ship. 93), but only to his doings abroad.

The contracts made abroad are usually in his name, as well as by him, and not by the owners, and he only to sue or be sued.  Abbott on Shipp., pt. 2, ch. 2, § 5.

In Waring et al. *v.* Clarke, which was a tort by the master at home, in a collision of two boats, the whole amount of the injury was awarded.  See also 1 Howard, 23; 3 Kent, Comm. 238.  So principle, no less than precedent, requires it now, in admiralty as well as common law, when the master is usually not a part-owner, but a mere agent of the owners, and doing damage, as here, by unskilfulness or neglect, and not by

wilful misconduct. Ware, D. C. 208; 1 East, 106. For this, surely, those should suffer who selected him *respondet superiori*. 1 East, 106; Abbott on Ship., pt. 2, ch. 2, § 9; 2 Kent, Comm. 218.

It is a mistake, likewise, to suppose, as some have, that the rule of damage is thus higher in admiralty than at common law, or when counting on the tort rather than contract. The only difference is, that in admiralty, if counting on the contract, doubts exist whether a recovery can be had on the precedents, while, if counting on the tort, no doubt exists, the place of the tort being clearly on the sea, and within admiralty jurisdiction. Nor do I see any sound reason for not sustaining this case in admiralty, when jurisdiction exists there over the subject, because this proceeding is *in personam* and not *in rem*. 6 Am. Jur. 4; 2 Bro. Civ. and Adm. Law, 396; 2 Gall. 461, 462; Hard. 173.

The jurisdiction is one thing, the form of proceeding another; and it is only when the vessel itself is pledged, and no personal liability created, so as to lay a foundation for an action at law, that the form of proceeding seems to help to give jurisdiction in admiralty, where alone the libel *in rem* in such case can be followed. 3 D. & E. 269.

But even then, I apprehend, the subject-matter must be proper for admiralty, or it could not be prosecuted there *in rem*, because, if the subject-matter is a carriage or horse, rather than a ship or its voyage, or something maritime, admiralty would get no jurisdiction by the thing itself being pledged, or to be proceeded against. The Fair American, 1 Peters, Adm. 87; Duponceau on Jurisdiction, 22, 23.

Indeed, the rule in England to this day seems to be adverse to proceeding in admiralty at all, even *in rem*, to recover freight. Abbott on Shipp. 170. King et al. *v.* Shepherd et al., 3 Story, 319, was a libel, *in personam*, against a common carrier by water, and held that the liability was the same as on land, and an act of God to excuse must be immediate, and that the burden of the excuse rests on the respondents, and they are not discharged by a wreck, but must attend to the property till safe or restored.

So it has been adjudged by this court to be proper to prosecute in admiralty for marine torts, *in personam* as well as *in rem*. Manro *v.* Almeida, 10 Wheat. 473; The Appollon, 9 Wheat. 362; Bee, Adm. 141; The Cassius, 2 Story, R. 81.; 14 Peters, 99. See also the rules of this court (1845), for admiralty practice, the 14th, 16th, and 17th (3 Howard, 7, Preface), and which expressly allow in libels for freight proceedings *in rem* or *in personam*, and in some trespasses to property either mode.

I ·concur, therefore, in the judgment of the court, affirming the decree for full damages, but on the ground of a recovery for the wrong committed as a marine tort, rather than on any breach of contract which can be prosecuted by these· plaintiffs, and in admiralty.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Rhode Island, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit· Court in this cause be and the same is hereby affirmed, with costs, and damages at the rate of six per centum per annum.